**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **OMAR ABU ALI, et al.,** |
| **Petitioners,** |
| **v.** |
| **JOHN ASHCROFT, et al.,** |
| **Respondents.** |

**Civil Action No.  04-1258 (JDB)**

**MEMORANDUM OPINION**

"The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights." United States v. Morgan, 346 U.S. 502, 506 n.3 (1954) (quotation omitted).  This case requires the Court to give substance to those words.  Petitioner Ahmed Abu Ali ("Abu Ali") is a citizen of the United States who, through his parents, has filed a petition for a writ of habeas corpus against several officials of the United States ("respondents" or "United States") challenging his ongoing detention since June 2003 in a prison of the Kingdom of Saudi Arabia allegedly at the behest and ongoing supervision of the United States.

Petitioners have provided evidence, of varying degrees of competence and persuasiveness, that:  (i) the United States initiated the arrest of Abu Ali in Saudi Arabia; (ii) the United States has interrogated Abu Ali in the Saudi prison; (iii) the United States is controlling his detention in Saudi Arabia; (iv) the United States is keeping Abu Ali in Saudi Arabia to avoid constitutional scrutiny by United States courts; (v) Saudi Arabia would immediately release Abu Ali to United

States officials upon a request by the United States government; and (vi) Abu Ali has been subjected to torture while in the Saudi prison.  The United States does not offer any facts in rebuttal.  Instead, it insists that a federal district court has no jurisdiction to consider the habeas petition of a United States citizen if he is in the hands of a foreign state, and it asks this Court to dismiss the petition forthwith.  The position advanced by the United States is sweeping.  The authority sought would permit the executive, at his discretion, to deliver a United States citizen to a foreign country to avoid constitutional scrutiny, or, as is alleged and to some degree substantiated here, work through the intermediary of a foreign country to detain a United States citizen abroad.

The Court concludes that a citizen cannot be so easily separated from his constitutional rights.  Earlier this year, the Supreme Court confirmed the fundamental right of a citizen to be free from involuntary, indefinite confinement by his government without due process.  See Hamdi v. Rumsfeld, 124 S. Ct. 2633, 2647 (2004); id. at 2661 (Scalia, J., dissenting); see also Rasul v. Bush, 124 S. Ct. 2686, 2692 (2004).  Abu Ali was not captured on a battlefield or in a zone of hostilities -- rather, he was arrested in a university classroom while taking an exam.  The United States has therefore not invoked the executive's war powers as a rationale for his detention -- instead, the United States relies on the executive's broad authority to conduct the foreign affairs of the country as a basis to insulate Abu Ali's detention from judicial scrutiny.  There are, to be sure, considerable and delicate principles of separation of powers that dictate caution and will narrow the inquiry in this case.  Such principles, however, have never been read to extinguish the fundamental due process rights of a citizen of the United States to freedom from arbitrary detention at the will of the executive, and to access to the courts through the Great Writ of habeas

corpus to challenge the legality of that detention.

The present posture of this case requires this Court to accept petitioners' well-supported allegations, to which the United States has not responded.  The United States' broad assertion of authority, and corresponding contention that this Court lacks jurisdiction, cannot withstand petitioners' assertions at this time.  The Court will accordingly authorize expeditious jurisdictional discovery in this matter to further explore those contentions.  The process of defining the scope of that discovery is set out in the accompanying order.  In the meantime, the request of the United States to dismiss the petition for lack of habeas corpus jurisdiction will be denied.

## BACKGROUND[1]

### I.     The Arrest of Abu Ali

Petitioner Ahmed Abu Ali ("Abu Ali") is an American citizen who was born in Houston, Texas.  See Petition ¶ 25; id. Ex. A (Birth Certificate).  After graduating as valedictorian of his high school class in Virginia, he enrolled as a scholarship student at the Islamic University of Medina in Saudi Arabia.  See Petition ¶¶ 26-27.  On June 11, 2003, while he was taking his final exam at the university, Saudi security officers entered his classroom and arrested him.  Since that day, Abu Ali has been detained indefinitely in a Saudi prison without charge or access to counsel. See Petition ¶¶ 26-28.

At about the same time that Abu Ali was arrested, three other Americans in Saudi Arabia were also apprehended by Saudi officials.  See id. ¶ 29.  Unlike Abu Ali, each of these individuals

---

[1]  The facts set forth here are drawn from the Petition and various affidavits and other supporting materials submitted by petitioners.  The government has not submitted any factual materials in response to petitioners' factual allegations.  On a motion to dismiss based on insufficiency of jurisdictional allegations, such factual allegations must be taken as true, with all reasonable inferences drawn in petitioners' favor.  See infra at 20-21.

was extradited a month later to the United States.  See id.  Once in the United States, they were

charged, along with eight other Northern Virginia men, with undertaking paramilitary training to

wage a terrorist jihad on behalf of Muslims.  See United States v. Royer, Crim. No. 03-296-A

(E.D. Va.).  Abu Ali thus was the only American citizen not extradited to the United States and

charged with a crime.

FBI agents raided Abu Ali's home in Virginia on June 16, 2003, less than a week after he

was arrested in Saudi Arabia.  The search warrant was issued by the United States District Court

for the Eastern District of Virginia (the same court in which the Royer proceedings were located),

and instructed the agents to look for weapons, cellular phones, and documents tending to show a

conspiracy between Abu Ali and four of the defendants in the Royer case.  See Petition ¶ 31; id.

Ex. B (Search Warrant).  Some time later, a prosecutor in the Royer proceedings would

acknowledge that the search of Abu Ali's home was conducted "in connection with" the Royer

prosecution.  See Petition ¶ 32; Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 10.

Roughly five days after Abu Ali was arrested, and at about the same time as the raid on his

home took place, FBI agents visited the Saudi prison in which Abu Ali was detained and watched

as he was interrogated by Saudi officials.  See Petition ¶ 32; Aff. of Omar Abu Ali, Sept. 20,

2004, ¶ 5.  The prosecutor in the Royer case has acknowledged that this interrogation took place.

Id.  The prosecutor says that during the interrogation Abu Ali confessed to joining a "clandestine

al Qaeda cell" and admitted that "al Qaeda told him he must either conduct terrorist operations or

return to the United States and establish an al Qaeda cell."  Id.

## II.  The Months Following the Detention

Abu Ali's parents, also petitioners in this matter, assert that Abu Ali was held

incommunicado for at least a month after his arrest.  <u>See</u> Petition ¶ 33.  They claim that they

sought assistance from the State Department, but their requests were initially ignored.  <u>See</u> Aff. of

Omar Abu Ali, Sept. 20, 2004, ¶ 7.  Later, they say, the State Department told them that Saudi

Arabia did not permit the United States Embassy to have access in the first month of his detention,

and that the Saudis had failed to respond at all to several diplomatic notes regarding Abu Ali.  <u>See</u>

<u>id.</u>

      Abu Ali's parents took their concerns to a newspaper reporter who had been covering the

<u>Royer</u> prosecution.  In a July 2003 article, that reporter quoted a Saudi Embassy spokesman as

saying that the United States Legal Attache office -- the name for the FBI overseas station -- "had

full and complete and direct access" to Abu Ali from the moment of his arrest.  The Saudi official

explained:  "For us, it was a representative of the U.S.  So the U.S. Embassy had full access, as far

as we were concerned."  <u>Id.</u>  At about this time, Abu Ali's parents say they threatened to sue the

State Department for failing to secure the safety of a United States citizen.  They claim that, in

response, Matthew Gillen, the Director of U.S. Consular Affairs in Saudi Arabia, met with Abu

Ali in the Saudi prison in early July.  Abu Ali's parents also received the first of several phone

calls from their son on July 31, 2003.  <u>See id.</u>  From that point on, they would maintain

intermittent contact with Abu Ali through reports from consul visits and occasional phone

conversations.

      In September 2003, several FBI agents traveled to Saudi Arabia and interrogated Abu Ali

for at least four days.  <u>See</u> Petition ¶ 36; Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 1.  According to

an affidavit from Abu Ali's mother, Abu Ali told her in a phone call that the FBI agents had

threatened to declare him an enemy combatant and send him to Guantanamo Bay, Cuba, if he did

not cooperate.[2]  <u>See</u> Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 1.  Consul Gillen would later tell the family that Abu Ali had also told him about this threat during one of his consul visits to the prison.  <u>See</u> Petition ¶ 36; Aff. of Omar Abu Ali, Aug. 13, 2004, ¶ 1.  Abu Ali's mother also says that Abu Ali told her the FBI agents threatened to put him on trial in Saudi Arabia without counsel.  <u>See</u> Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 1.

Abu Ali's father, who works as a system analyst at the Royal Embassy of Saudi Arabia in Washington, D.C., prevailed on his contacts in the Saudi government to assist him in his search for information regarding the detention of his son.  <u>See</u> Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 1.  He claims that unidentified officials in the Saudi Embassy "consistently told me that Ahmed has not violated Saudi laws, and that there are no plans to prosecute him in Saudi Arabia."  Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 2.  He also says that he spoke "to several high-ranking officials at the Saudi Embassy who are familiar with Ahmed's case, and whom I am unable to name for security and privacy concerns."  <u>Id.</u>  He claims that they "have described Ahmed's arrest and detention as an 'American case' that Saudi Arabia has no control over due to strong political pressure from the U.S. government to keep Ahmed in Saudi custody."  <u>Id.</u> ¶ 2.

Petitioners allege that they were receiving other indications at the time as well that the United States was behind the detention of their son.  Abu Ali's father asserts that in September 2003 he asked a high-ranking government official in Saudi Arabia to visit his son in order to check on his safety.  The official returned with the information that he "was instructed to 'stay

_____

[2] Later, in a June 19, 2004, telephone call, Abu Ali's mother says that he told her that he had been told that the U.S. government was waiting for the relevant Supreme Court rulings before deciding whether or not to declare him an "enemy combatant."  Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 6.

away' because the U.S. was behind the case." Id. ¶ 3.  Abu Ali's parents also describe a November 2003 phone call in which Abu Ali told them that Consul Charles Glatz of the United States Embassy in Saudi Arabia had informed him that his case was in the hands of Washington, not the Saudi government.  See Aff. of Faten Abu Ali, August 13, 2004, ¶ 2.  Petitioners claim that Consul Glatz told Abu Ali (who then told them) that he had received this information from the FBI.  See id.

### III.    The Royer Proceedings

Meanwhile, the Royer prosecution was proceeding forward in the United States.  In a hearing on a motion to suppress certain statements that he had made while being questioned in Saudi Arabia, Sabri Benkhala -- one of the three Americans who had been arrested in Saudi Arabia and then extradited -- testified that Saudi officials, while interrogating him, had shown him pictures of people who appeared to have been physically tortured.  See Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9.  Benkhala also testified that when he was visited for the first time by a U.S. Consul in the Saudi prison, the consul told Benkhala that he had been arrested at the request of the FBI.  See id.  Finally, according to Benkhala, a Saudi General who was present at his meeting with the U.S. Consul officer apologized to him afterwards and told him "you have not broken any laws in Saudi Arabia, and we know you're a good person . . . we were requested by the FBI to arrest you."  The presiding judge in Royer concluded that the statements Benkhala had made during the Saudi interrogation were coerced and excluded them from trial.  See Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9.

Six of the defendants in the Royer proceedings entered pleas, three were convicted at trial, and two were acquitted (one of the acquittals was Benkhala).  Abu Ali's father states in an

affidavit that members of the FBI and the U.S. Attorney's Office told his former attorney, Martin McMahon, that a grand jury had considered the case against Abu Ali and had found no evidence to indict him.  See Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 10.  Abu Ali's father also says that friends and family members who were called as witnesses by the grand jury have confirmed that the grand jury deliberated from July 2003 through the first few months of 2004.  See id.

Petitioners state that in May 2004 they reached an agreement with the prosecutor leading the Royer investigation through which Abu Ali would be released in exchange for a final "exit interview" at which counsel would be present for Abu Ali.  Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9.  Petitioners say that their then-counsel sent a letter to the U.S. Ambassador in Saudi Arabia requesting his intervention in securing the arrangement.  Id.  For reasons that are unclear from the record, this arrangement fell through.

Nevertheless, Abu Ali's mother avers that in a May 20, 2004, meeting between the FBI and her now ex-counsel, Stanley Cohen, the FBI told Cohen that they would release Abu Ali if he revoked his U.S. citizenship and lived in another country.  See Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 6.  At the same time, petitioners claim that the Washington Field Office of the FBI began stating publicly that the office had no further interest in Abu Ali's detention.[3]  Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 9.  The Assistant Director in charge of the FBI Washington Field Office is quoted in a June 18, 2004, Washington Post article as saying that he doesn't "speak for the entire

---

[3] According to petitioners, this is the office that had led the United States investigation of Abu Ali.  See Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 13.  Petitioners relate one instance where eight senior agents from the Washington Field Office met with fifty members of a mosque in the Washington, D.C. area.  The Assistant Director of the FBI Washington Field Office explained at this meeting:  "The one thing I'll tell you that Pat Cook and I, who['s] about to address this issue, he and I, I ask him every third day is he going to be released?  Is he going to be released?"  See id.

U.S. government," but that when he asked agents in his office whether they have a "continuing interest in this individual . . . the answer I got was no." He also said that he thought Abu Ali was "within a week of being released" in early May 2004. Caryle Murphy, <u>Protesters Seek Release of Saudi Prisoner</u>, Washington Post, June 18, 2004, at B3.

## IV.    The May 14, 2004, Meeting with Consul Gillen

Petitioners, accompanied by their then-counsel Ashraf Nubani, and the Executive Director and the Governmental Relations Coordinator of the Council on American Islamic Relations, met with Consul Gillen on May 14, 2004. <u>See</u> Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1; Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 15. Consul Gillen showed petitioners two documents: a May 10, 2004, email from Consul Glatz to Consul Gillen, and an undated cable from the United States Embassy in Riyadh to the State Department. <u>See</u> Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1. Petitioners attest that Consul Gillen refused to give them copies of the documents, but allowed them to copy the documents manually. <u>See</u> Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1.

Abu Ali's mother has submitted an affidavit in which she transcribes the contents of these documents. <u>See</u> Aff. of Faten Abu Ali, Sept. 20, 2004. As reproduced by Abu Ali's mother, the email from Consul Glatz to Consul Gillen states that Abu Ali declined to see Glatz during his most recent consul visit, and that the Saudi Colonel who is the prison director refused to take him into the cell block to see Abu Ali. <u>See</u> Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1a. The cable continues: "The colonol said that he understood that we could have him rendered to the U.S. at anytime. He added that Abu Ali is saying that he would not voluntarily go back to the U.S., but

was interested in going to Sweden."  Id.  As transcribed by Abu Ali's mother, the cable states:

> SBU Col Al-Qahtani commented to Conoff [consular officer] that he understood that
> Abu-Ali could be rendered to American authorities at any time if the USG [US
> Government] made a formal request.  He added that he understood that if Abu-Ali were
> deported from Saudi Arabia he would not want to return to the U.S. but has been thinking
> of traveling to Sweden.

Aff. of Faten Abu Ali, Sept. 20, 2004, ¶ 1b.[4]

Petitioners state that Consul Gillen told them at the meeting that "there were no charges

against [Abu Ali] and no current investigation of him."  Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3.

According to petitioners, Consul Gillen also told them that he would personally send a formal

request for Ahmed's release.  Aff. of Faten Abu Ali, Aug. 13, 2004, ¶ 3; Aff. of Omar Abu Ali,

Aug. 13, 2004, ¶ 6.  A month later, however, in a meeting attended by Abu Ali's father and

Gillen, petitioners say that Gillen explained that he would be unable to send the letter because

there was an ongoing investigating of Abu Ali in the United States Department of Justice.  Aff. of

Omar Abu Ali, Aug. 13, 2004, ¶ 6.

Abu Ali's family appealed to their political representatives for assistance.  On July 21,

2004, Congressman David Woo's office wrote to Abu Ali's uncle that the State Department "has

indicated that they are prepared to take action on Ahmed's behalf once he receives final clearance"

from the Department of Justice.  Likewise, in a June 2, 2004, meeting, Ann Rust, Department of

Constituent Services from Congressman Tom Davis's office, informed Abu Ali's parents that the

---

[4]  Abu Ali's mother explains that she asked Abu Ali during a phone call whether he had
ever requested to go to Sweden.  She says that he "expressed surprise and confusion regarding my
questions, and replied that he did not ever make such a request."  Aff. of Faten Abu Ali, Sept. 20,
2004, ¶ 4.  She told Abu Ali that if he were released, he should not go to Sweden or any other
country, but instead should come home to clear his name.  She says he replied, "No, nothing is in
my hands, I'll go wherever they tell me to . . . I have no free will to decide, no one has ever
consulted me."  Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 11.

State Department had told her that Abu Ali's release would take place "once all government agencies were no longer interested in him."  Aff. of Omar Abu Ali, Sept. 20, 2004, ¶ 14.

In the meantime, Abu Ali's parents continued pressing their connections with Saudi officials.  Abu Ali's father attests that in May 2004, an official at the Saudi embassy told him that if he ever wanted his son to come back home, he should pressure U.S. officials to request his release.  Aff. of Omar Abu Ali, Sept. 20, 2004, ¶  3.

## V.    Allegations of Torture

Petitioners relate their growing concern that Abu Ali has been subjected to torture during his detention in Saudi Arabia.  They maintain that they have received information from an unidentified eyewitness in Saudi Arabia who said that he saw Abu Ali experiencing so much pain in his hands that he was unable to pick up a pen to sign documents.  Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 2.

At the same time, petitioners cite two instances where the Assistant U.S. Attorney leading the Royer prosecution has allegedly made comments indicating that Abu Ali has had his fingernails removed.  Aff. of Faten Abu Ali, Sept. 17, 2004, ¶¶ 3, 6.  The first of these instances was allegedly in a meeting between the Assistant U.S. Attorney and the defendants in the Royer prosecution.  According to petitioners, Seifullah Chapman, one of the defendants, reported to them in August 2004 that the prosecutor had said that Abu Ali "doesn't have to worry about clipping his fingernails anymore."  Aff. of Faten Abu Ali, Sept. 17, 2004, ¶ 3.

Salim Ali, a lawyer for one of the Royer defendants, describes in an affidavit a conversation that he claims he had with the same prosecutor while they were waiting at a courthouse in June 2003 after a hearing in the Royer case.  Salim Ali says that he asked the

prosecutor whether Abu Ali should be returned to the United States to face charges. He explains that the prosecutor "smirked and stated that 'he's no good for us here, he has no fingernails left.'" Aff. of Salim Ali, Oct. 12, 2004, ¶ 6. In a September 2004 phone call with Abu Ali, his parents mentioned the prosecutor's comments, to which Abu Ali replied, "there are hidden things which you don't know about that are even worse."[5] Aff. of Fatim Abu Ali, Sept. 17, 2004, ¶ 6.

Petitioners also provide an affidavit from a specialist for Saudi Arabia from Amnesty International USA who testifies that Abu Ali is at a serious risk of torture while he remains detained in Saudi Arabia. He describes many instances of torture recounted by Westerners who have been arrested in Saudi Arabia, and notes that the U.S. Department of State itself describes "credible reports" that Saudi authorities have "abused detainees, both citizens and foreigners." Aff. of Brian Evans, Sept. 17, 2004, at 1-2.

## VI.    The Proceedings in this Action

On July 28, 2004, Abu Ali's parents filed in this Court a petition for a writ of habeas corpus on behalf of their son. The petition challenges his detention under the United States Constitution and other sources of domestic and international law, and names as respondents the Attorney General of the United States, the Director of the FBI, and several other United States officials ("respondents" or "United States"). The petition seeks a variety of different forms of relief, but the essence of the request is that the Court determine whether Abu Ali's rights are being

---

[5] One of the FBI agents who interrogated Abu Ali in September 2004 delivered a letter to Abu Ali's parents in which Abu Ali described the FBI agent as a "great person," and said that he did not write the letter under "any pressure." When Abu Ali's mother asked Abu Ali about the letter, Abu Ali replied, "don't ask me these questions, it hurts me when you ask these questions." Abu Ali's mother asked him, "do they hurt you?", and he replied, "yes." Aff. of Faten Abu Ali, Aug. 18, 2004, ¶ 3.

violated by his detention in a Saudi prison and, if they are, issue a writ requiring the United States to release Abu Ali, or obtain his release, and bring him before the Court for further proceedings. See Petition at 24-25.

A few hours after filing the petition, Abu Ali's parents claim to have received a call from an official at the State Department saying that the United States had been informed by the Saudi government that they were planning shortly to bring charges against Abu Ali. See Mot. Prelim. Inj. at 1. Within a week of that call, petitioners filed a motion for a preliminary injunction or a temporary restraining order asking this Court to instruct the United States government to refrain from pressuring the Saudi government to bring charges against Abu Ali. The United States responded with declarations from the State Department official who placed the call to petitioners and from the Deputy Assistant Director of Operations in the Counterterrorism Division of the FBI, stating that Saudi authorities had told the FBI as early as July 18, 2004 -- more than a week before petitioners filed this action -- that they intended to bring criminal charges against Abu Ali. According to the declarations, this information was forwarded to the State Department in a cable from the U.S. embassy in Riyadh dated July 26, 2004, and Abu Ali's parents were informed two days later. See Decl. of Leigh Rieder ¶¶ 2-4; Decl. of Willie T. Hulon ¶ 2.

This Court denied petitioners' motion for a preliminary injunction. See Mem. Op. & Order, dated Aug. 31, 2004. The Court explained that the jurisdictional basis for the habeas petition was uncertain, id. at 5-10, and that the particular relief petitioners sought in their motion -- an order instructing the United States government to refrain from communicating anything to the Saudi government that would lead the Saudi government to press charges against Abu Ali -- was problematic, id. at 11-14. Such an order would have entangled the judiciary in the diplomatic

communications between the United States and an ally on the one hand, and would not have
remedied any discernible irreparable harm to Abu Ali on the other, inasmuch as even complete
silence by the United States would have left the Saudi government free to continue to detain and
interrogate Abu Ali, and even to press charges if they wished.  See id.

Some time earlier, the Court had issued an order requiring the United States to show cause
why the petition for a writ of habeas corpus should not be granted.  In response, the United States
filed papers in which it asks the Court to dismiss the habeas petition as a matter of law.  The
United States does not offer any evidence (or even contentions) rebutting petitioners' claims
regarding its role in the detention of their son.  Instead, the United States seeks dismissal on the
theory that a federal court lacks jurisdiction to issue a writ of habeas corpus where the prisoner is
currently being held by a foreign custodian, no matter what role the United States allegedly has
played in his detention.  See Resp'ts' Supplemental Filing at 1-2.

In response, petitioners submitted additional legal arguments and affidavits to support the
legal claims advanced and relief sought in their habeas petition.  The government's request to
dismiss the petition is now fully briefed and ready for decision by the Court.  To the Court's
knowledge, the Saudi government has not brought any charges against Abu Ali.

VII.    **Summary of Factual Allegations**

At this time and juncture, then, the facts before this Court consist essentially of petitioners'
allegations, supported by several affidavits and other materials.  In brief, those well-supported
factual allegations paint the following picture.  This is merely a recitation of the allegations and
reasonable inferences that the Court must at this stage in the proceedings take as true; the Court is
not at this time finding the allegations to be true.

Abu Ali is a citizen of the United States who was born and raised in this country.  He was arrested by Saudi officials while taking an examination at the university he was attending in Saudi Arabia.  The United States orchestrated the detention and was intimately involved from the very beginning.  FBI agents attended his interrogation by Saudi officials mere days after his arrest; FBI agents raided his parents' home in Virginia at roughly the same time; and three other United States citizens living in Saudi Arabia were arrested almost simultaneous with Abu Ali and extradited to the United States to stand trial, where one of them testified that he was told by United States and Saudi officials that he was arrested at the behest of the United States.  Abu Ali has said that he was told the same thing by an official from the United States Embassy.

Saudi officials have described the detention privately as a United States matter, have acknowledged publicly that the United States has been involved throughout his detention, and have told United States officials that they would release Abu Ali at the request of the United States.  FBI agents have interrogated Abu Ali at length in the Saudi prison.  United States officials have also indicated to Abu Ali and to his parents on several occasions that they could release him if he cooperated or, if he did not, either keep him in the Saudi prison where he would be tried without counsel or send him to Guantanamo Bay where he would be detained as an "enemy combatant."  More recently, officials from the State Department and from the United States Embassy in Saudi Arabia have indicated to Abu Ali's parents and to others that Abu Ali would be released as soon as the Department of Justice completed its investigation of him.  An agreement between Abu Ali's parents and the United States on the terms of Abu Ali's release was nearly reached on more than one occasion, but it has fallen through each time.

According to petitioners, the United States has chosen to keep Abu Ali in Saudi Arabia

-15-

because a grand jury refused to return an indictment against Abu Ali in the United States, and because United States officials want to continue to obtain information from him in a context that is free of constitutional scrutiny. There is at least some circumstantial evidence that Abu Ali has been tortured during interrogations with the knowledge of the United States. FBI agents have despaired at his continued detention and more than one United States official has stated that Abu Ali is no longer a threat to the United States and there is no active interrogation. Nonetheless, he has been held indefinitely without charge, explanation for his detention, or access to counsel since the time of his arrest in June 2003.

## <u>ANALYSIS</u>

There is no principle more sacred to the jurisprudence of our country or more essential to the liberty of its citizens than the right to be free from arbitrary and indefinite detention at the whim of the executive. As recently as this year, the Supreme Court reaffirmed "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law." <u>Hamdi</u>, 124 S. Ct. at 2647; <u>see</u> <u>also</u> <u>id.</u> at 2661 (Scalia, J., dissenting) ("The very core of liberty secured by our Anglo-Saxon system of separated powers has been freedom from indefinite imprisonment at the will of the Executive."); <u>Rasul</u>, 124 S. Ct. at 2692 ("Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land.") (quotation omitted).

This right draws its force from -- and would be meaningless without -- the ability of the citizen to challenge his detention through a petition for a writ of habeas corpus. <u>See</u>, <u>e.g.</u>, <u>Lonchar v. Thomas</u>, 517 U.S. 314, 322 (1996) (describing the writ as the "highest safeguard of liberty")

(quotation omitted); Harris v. Nelson, 394 U.S. 286, 290-91 (1969) ("The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action.").  The writ of habeas corpus -- often termed the Great Writ -- arose from the common law of England, was shaped in the forge of the early colonial experience, received recognition in the United States Constitution (the only common law writ to be so recognized) and the first Judiciary Act, and has evolved in countless legislative enactments and judicial rulings since.  Throughout, the writ has stood as an indispensable safeguard of the freedom of citizens and a constant remedy against wrongful detention at the whim of the executive.  See Rasul, 124 S. Ct. at 2692 ("The judges of England developed the writ of habeas corpus largely to preserve these immunities from executive restraint.") (quotation omitted); Morgan, 346 U.S. at 506 n.3 ("The writ of habeas corpus commands general recognition as the essential remedy to safeguard a citizen against imprisonment by State or Nation in violation of his constitutional rights.") (quotation omitted); Ex parte Yerger, 8 Wall. 85, 95 (1869) ("The great writ of *habeas corpus* has been for centuries esteemed the best and only sufficient defence of personal freedom") (emphasis in original).

Consistent with its high purpose, courts have given the writ an exceptionally broad reach. "[M]odern habeas jurisprudence emphasizes the breadth and flexibility of the Great Writ in vindicating the fundamental concern in a democratic society of checking the powers of the state vis-a-vis an individual in custody."  Chatman-Bey v. Thornburgh, 864 F.2d 804, 807 (D.C. Cir. 1988) (en banc); see Ex parte McCardle, 6 Wall. 318, 325-26 (1868) (affirming that the habeas scheme is "of the most comprehensive character"); Johnson v. Avery, 393 U.S. 483, 485 (1969) ("The Court has steadfastly insisted that there is no higher duty than to maintain [the writ] unimpaired.") (quotation omitted).

The writ has accordingly been applied to a wide range of detentions of American citizens. See Rasul, 124 S. Ct. at 2692 ("Consistent with the historic purpose of the writ, this Court has recognized the federal courts' power to review applications for habeas relief in a wide variety of cases involving Executive detention."); Maleng v. Cook, 490 U.S. 488, 492 (1989) ("[W]e have very liberally construed the 'in custody' requirement for purposes of federal habeas."); see also 3 William Blackstone, Commentaries 131 (describing habeas as "the great and efficacious writ, in all manners of illegal confinement"). The D.C. Circuit, sitting en banc, has emphasized the "strong High Court disapproval of formalistic analysis in the context of habeas corpus" and instructed a court assessing whether the habeas statute applies to a particular form of custody to "cut[] through all forms" and affirm the purpose of the writ as a "fundamental safeguard against unlawful custody." Chatman-Bey, 864 F.2d at 807 (quotation omitted); see Hensley v. Municipal Court, 411 U.S. 345, 350 (1973) (explaining that the Court has "consistently rejected interpretations of the habeas corpus statute that would suffocate the writ in stifling formalisms").

Notwithstanding these principles, however, the United States argues that the habeas petition for Abu Ali should be dismissed as a matter of law, no matter how extensive a role the United States might have played and continues to play in his detention, for the sole reason that he is presently in a foreign prison. A federal court, they claim, "simply lacks jurisdiction to grant habeas relief where the prisoner seeking the writ is being held by a foreign custodian, even where the United States allegedly has been involved in the prisoner's incarceration in the first place." Resp'ts' Supplemental Filing at 1-2. This argument rests on one fact and one fact alone: Abu Ali is presently being held by a foreign government. The moment this is the case, the United States

claims, the courts are immediately stripped of jurisdiction over any habeas claim.[6]

This position is as striking as it is sweeping.  The full contours of the position would permit the United States, at its discretion and without judicial review, to arrest a citizen of the United States and transfer her to the custody of allies overseas in order to avoid constitutional scrutiny; to arrest a citizen of the United States through the intermediary of a foreign ally and ask the ally to hold the citizen at a foreign location indefinitely at the direction of the United States; or even to deliver American citizens to foreign governments to obtain information through the use of torture.[7]  In short, the United States is in effect arguing for nothing less than the unreviewable power to separate an American citizen from the most fundamental of his constitutional rights merely by choosing where he will be detained or who will detain him.

This Court simply cannot agree that under our constitutional system of government the executive retains such power free from judicial scrutiny when the fundamental rights of citizens have allegedly been violated.  As the Supreme Court stated in Reid v. Covert, 354 U.S. 1, 6 (1957), "we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. . . .  When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land."

---

[6]  Respondents also mention, on occasion, that Abu Ali was not just detained but also arrested by the Saudi authorities, see Resp'ts' Resp. Order Show Cause ("Resp. Show Cause") at 2, but at no point do their arguments appear to turn on that fact, see id. at 3-15.  Instead, their entire brief rests on the assertion that an American citizen loses any right to habeas once he is in the hands of a foreign power.

[7]  The Court does not mean to suggest that torture has been used in this or in any other case; merely that the ability to enlist a foreign body to use torture against a United States citizen, free of any judicial scrutiny, is encompassed by the position advanced by the United States in this case.

The United States premises its claim to this power on three arguments of law:  (i) what they perceive to be an "implicit territorial restriction on the Great Writ"; (ii) the contention that jurisdiction over the petition in this case is foreclosed by the Supreme Court's decision in Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948) (per curiam), and the D.C. Circuit's decision in Keefe v. Dulles, 222 F.2d 390 (D.C. Cir. 1954); and (iii) the suggestion that federal jurisdiction over the habeas claim in this case would run afoul of the act of state, separation of powers, and political question doctrines.  The Court will address each of these arguments in turn in the sections below.

To briefly summarize its conclusions here, however, the Court holds that the United States may not avoid the habeas jurisdiction of the federal courts by enlisting a foreign ally as an intermediary to detain the citizen.  The instances where the United States is correctly deemed to be operating through a foreign ally as an intermediary for purposes of habeas jurisdiction will be exceptional, and a federal court's inquiry in such cases will be substantially circumscribed by the separation of the powers.  Nonetheless, the executive's authority over foreign relations has never in our nation's history been deemed to override entirely  the most fundamental rights of a United States citizen -- the right to challenge as arbitrary and unlawful his detention allegedly at the will of the executive.  This authority likewise has never been held to eliminate the essential remedy against such unlawful detentions -- the Great Writ of habeas corpus.

**I.    Standard of Review**

On a motion to dismiss for lack of jurisdiction, the petitioner bears the burden of establishing the jurisdiction of the Court.  See Dist. of Columbia Ret. Bd. v. United States, 657 F. Supp. 428, 431 (D.D.C. 1987); Gordon v. Ashcroft, 283 F. Supp. 2d 435, 437 (D. Mass. 2003).

Where, as here, the respondents challenge only the legal sufficiency of the petitioners' jurisdictional allegations, the district court should take the petitioners' factual allegations as true, and draw all reasonable inferences in the petitioners' favor.  See Hawk v. Olson, 326 U.S. 271, 272 (1945); Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 39 (D.C. Cir. 2000).

The court need not limit itself to the allegations of the petition.  See Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987).  Instead, the court may consider any materials outside the pleadings as it deems appropriate to determine whether it has jurisdiction over the case.  See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

## II.    The Habeas Statute

The federal district courts, as courts of limited jurisdiction, possess only such authority as is conferred by an act of Congress.  See Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); Friends of the Earth v. United States Envtl. Prot. Agency, 333 F.3d 184, 187 (D.C. Cir. 2003); Commodity Futures Trading Comm'n v. Nahas, 738 F.2d 487, 492 (D.C. Cir. 1984).  As a consequence, the Court must look, at least in the first instance, to the habeas statute to determine whether it has jurisdiction over the habeas petition in this case.  See Rasul, 124 S. Ct. at 2694-96; Muhammad v. Bureau of Prisons, No. 04-1114, 2004 WL 2191631, at *1 (D.C. Cir. Sept. 24, 2004).

The relevant sections of the habeas statute for present purposes are located in 28 U.S.C. §§ 2241-43.  The authority of the district courts to issue the writ is set out in section 2241.  That section provides, in relevant part:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective

jurisdictions.  The order of a circuit judge shall be entered in the records of the
district court of the district wherein the restraint complained of is had.
. . . .
(c) The writ of habeas corpus shall not extend to a prisoner unless--
(1) He is in custody under or by color of the authority of the United States or is
committed for trial before some court thereof; or
(2) He is in custody for an act done or omitted in pursuance of an Act of Congress,
or an order, process, judgment or decree of a court or judge of the United States; or
(3) He is in custody in violation of the Constitution or laws or treaties of the United
States . . . .

28 U.S.C. § 2241.  Section 2242 contains several rules regarding the information that must be

placed in the application for the writ of habeas corpus, including that the application "shall allege

the facts concerning the applicant's commitment or detention, the name of the person who has

custody over him and by virtue of what claim or authority, if known."  Id. § 2242.  Finally, section

2243 addresses the issuance of a writ by the court and provides, inter alia, that the writ "shall be

directed to the person having custody of the person detained," and the "person to whom the writ is

directed shall be required to produce at the hearing the body of the person detained."  Id. § 2243.

### A.    The Supposed "Implicit Territorial Limitation" on the Writ

The United States argues that these sections contain what they call an "implicit territorial

limitation of the Great Writ."  Resp. Show Cause at 3.  They insist that threaded through the

provisions excerpted above is an absolute requirement that a citizen's habeas petition name as a

respondent the immediate custodian who is exercising physical control over the petitioner, and

that this immediate custodian be "within the[] respective jurisdiction" of the district court.  See id.

Where the immediate custodian does not lie in the jurisdiction of the district court, the United

States maintains, then the district court lacks habeas jurisdiction; and where there is no immediate

custodian within the territorial jurisdiction of any district court, then no court has jurisdiction of

the citizen's petition at all.  See id.

This position is foreclosed by a line of precedent culminating in two recent Supreme Court cases. In the first of those cases, Rumsfeld v. Padilla, 124 S. Ct. 2711 (2004), the Court dismissed the habeas petition of an American citizen detained in a Naval Brig in Charleston, South Carolina, that was filed in the Southern District of New York and named as respondents several government officials who were outside of the jurisdiction of that court. The Court based its conclusion on two principles that confine habeas: the "immediate custodian" and the "district of confinement" rules. Id. at 2718-21, 2724-25. Together, the Court explained, these rules stand for the proposition that "in habeas challenges to present physical confinement--'core challenges'--the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official," and that the petitioner must file the petition in the district court for the district in which he is confined. Id. at 2717, 2724-25.

The Court explained, however, that there is a "recognized" exception to these rules in cases where

> "American[] citizens confined overseas (and thus outside the territory of any district court) have sought relief in habeas corpus." Braden [v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 498 (1973)] (citing cases). In such cases, we have allowed the petitioner to name as respondent a supervisory official and file the petition in the district where the respondent resides.

Id. at 2718, 2725 n.16; see also id. at 2718 n.9. The Court cited two cases where it allowed American citizens overseas to challenge the legality of their detention in habeas in the United States District Court for the District of Columbia notwithstanding the immediate custodian and district of confinement rules: Burns v. Wilson, 346 U.S. 137 (1953), where a court-martial convict incarcerated in Guam sued the Secretary of Defense, and United States ex rel. Toth v. Quarles, 350 U.S. 11 (1955), where a court-martial convict incarcerated in Korea sued the

Secretary of the Air Force.

The same day that it decided Padilla, the Supreme Court held in Rasul v. Bush that this Court -- the United States District Court for the District of Columbia -- had jurisdiction to entertain the habeas petition of a non-resident alien detained at Guantanamo Bay, Cuba.  124 S. Ct. at 2698.  In reaching that conclusion, the Supreme Court was required to consider whether the presence of the petitioner outside the jurisdiction of any district court divested the federal district courts of jurisdiction.  As it had done in Padilla, the Court read Braden v. 30th Judicial Circuit Court of Ky.[8] to hold that the presence of the petitioner in the territorial jurisdiction of the district court is not "'an invariable prerequisite'" to habeas jurisdiction.  Rasul, 124 S. Ct. at 2695 (quoting Braden, 410 U.S. at 495).  Rasul noted that Braden had been a departure from prior precedent in this regard, and that Braden had explained the departure by citing developments in the law that "had a profound impact on the continuing vitality" of that precedent.  Id.  Rasul observed that these developments "notably" included cases where the Court found habeas jurisdiction over the petitions of individuals "'confined overseas (and thus outside the territory of any district court).'" Id. at 2695 (quoting Braden, 410 U.S. at 498 (citing Burns and Toth)).

Continuing to rely upon Braden, Rasul explained that "the writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody," a district court acts "within its respective jurisdiction within the meaning of §

---

[8] The petitioner in Braden was a prisoner in Alabama who had filed a habeas petition in Kentucky challenging an indictment that had been filed against him in Kentucky.  The Court concluded that Braden was in custody in Kentucky for purposes of the habeas statute because Kentucky had lodged a detainer against petitioner and Alabama was acting as the "agent" of Kentucky in holding Braden pursuant to the Kentucky detainer.  Braden, 410 U.S. at 498-99 & n.4; see discussion infra at 33.

2241 as long as the custodian can be reached by service of process." Id. (quotation and alteration omitted). Therefore, the mere presence of the petitioner in Rasul (and, it follows, his immediate custodian) outside the jurisdiction of any district court did not preclude him from bringing a habeas petition in the United States District Court for the District of Columbia, and from naming as respondents various "custodians," who included the President of the United States, the Secretary of Defense, and others.[9] See id. at 2695, 2698. It is noteworthy that these were precisely the kind of "remote supervisory official[s]" that Padilla had explained the same day could not be named as respondents under the "immediate custodian" rule unless some exception to that rule applied.

The United States' arguments cannot plausibly survive these cases. The decisions of the Court finding an absence of jurisdiction in Padilla and the existence of jurisdiction in Rasul share at least one common feature: both recognize an exception to the "immediate custodian" and "district of confinement" rules when the petitioner and his immediate custodian are "outside the territory of any district court." Braden, 410 U.S. at 498. Where that is the case, the petitioner may name as respondents any of his custodians (not just the immediate custodians) and may file the claim in the court that has jurisdiction over those respondents. See, e.g., Gherebi v. Bush, 338 F. Supp. 2d 91, 95 (D.D.C. 2004) (citing Padilla and Rasul for the conclusion that individuals detained in Guantanamo Bay may bring a habeas petition in the United States District Court for the District of Columbia that names Secretary Rumsfeld as a respondent under the exception to

_____

[9] See also Al Odah v. United States, 321 F.3d 1134, 1136 (D.C. Cir. 2003) (listing the respondents in the Rasul action), rev'd sub nom, Rasul v. Bush, 124 S. Ct. 2686 (2004).

the "immediate custodian" and "district of confinement" rules).[10]

Respondents struggle mightily to respond to this exception. They suggest that the passages in Padilla discussing the exception can be ignored as dicta, because neither Padilla nor Braden in fact involved petitioners who were outside of the United States, and because Burns and Toth, the two decisions cited in Padilla, do not specifically address the jurisdiction of the Court. Resp. Show Cause at 12-13. At the outset, this description of the law is wrong. Burns stated quite explicitly that there was habeas jurisdiction under 28 U.S.C. § 2241 to review the constitutional claims of an American citizen court-martialed in Guam:

> [W]e are dealing with habeas corpus applicants who assert -- rightly or wrongly -- that they have been imprisoned and sentenced to death as a result of proceedings which denied them basic rights guaranteed by the Constitution. The federal civil courts have jurisdiction over such applications. By statute, Congress has charged them with the exercise of that power.

Burns, 346 U.S. at 139 (citing 28 U.S.C. § 2241). At any rate, this Court cannot disregard a rule of law that the Supreme Court described as "recognized" in one recent decision (Padilla); that was at the heart of both the reasoning and the outcome in another recent decision (Rasul); that it discussed in some detail in an earlier decision (Braden); and that was necessary to the holding of one decision involving an American citizen detained overseas (ex rel. Toth, where the Court affirmed the district court's issuance of the writ), and to the analysis of another (Burns, where the Court declined to issue the writ, but nevertheless addressed its jurisdiction over, and then the merits of, the petitioner's claim). This is far more than the concept of "dicta" can bear.

---

[10]  See also Gherebi v. Bush, 374 F.3d 727, 738 (9th Cir. 2004) (citing Padilla and Rasul for the proposition that there is an "exception to the immediate custodian and district of confinement rules where an American citizen is detained outside the territorial jurisdiction of any district court") (quotation omitted).

Respondents also maintain that the exception "abandons" the "immediate custodian" and "district of confinement" rules and treats them as nothing more than a "policy rule."  Resp'ts' Opp'n Mot. Prelim. Inj. at 13.  That is far from the truth.  The rules have continuing vitality and are rigorously applied.  As Rasul explained, however, they are "strictly relevant only to the question of the appropriate forum, not to whether the claim can be heard at all."  Rasul, 124 S. Ct. at 2695.  In Padilla, for example, the Supreme Court concluded that the United States District Court for the Southern District of New York lacked jurisdiction to hear the habeas petition of an individual incarcerated in a Naval Brig in South Carolina, and that the petitioner would therefore need to re-file his petition in the United States District Court for the District of South Carolina instead.  See 124 S. Ct. at 2727.[11]  The "immediate custodian" and "district of confinement" rules continue to play an important role in channeling a habeas petition into the court with jurisdiction over the petitioner and his immediate custodian, when possible.  That said, the law is clear that the scattered references in the habeas statute to "the person having custody of the person detained" and the courts exercising jurisdiction "within their respective jurisdictions" simply do not add up to a jurisdictional wall against habeas petitions for citizens detained overseas, implicit (as the United States would have it) or otherwise.[12]

---

[11]  See also Stokes v. United States Parole Comm'n, 374 F.3d 1235, 1237 (D.C. Cir. 2004) (dismissing habeas petition because "immediate custodian" and "district of confinement" rules require petitioner incarcerated in Ohio to file his petition in the United States District Court for the District of Ohio and name the warden of his prison as respondent).

[12]  That is, where a petitioner can name a respondent who is "within the[] respective jurisdiction" of the district court, 28 U.S.C. § 2241(a), and the respondent has "custody of the person detained" and the ability "to produce at the hearing" such person if necessary, 28 U.S.C. § 2243, the cases in this section indicate that the habeas statute is satisfied, and that the courts should not strain to read into the statute a barrier to habeas review, at least for the claims of citizens, that is not apparent on the face of the statute.

To be sure, this is just the beginning of the jurisdictional inquiry. The absence of a broad rule precluding federal jurisdiction over the habeas petition of a citizen held overseas (regardless of who is holding him) leaves remaining the question whether there ever can be habeas jurisdiction over the petition of a citizen held overseas in the specific circumstance where he is held by a foreign state. That issue raises serious and important questions of law that require careful assessment of the text of the habeas statute, decades of precedent regarding the meaning of the term "custody" in the statute, and important constitutional considerations on both sides of the ledger. It is to those questions that the Court now turns.

**B.    "In Custody"**

The turnkey of the habeas statute is the requirement of custody. The statute provides specifically that a district court cannot issue a writ of habeas corpus to an individual unless the individual "is in custody" either "under or by color of the authority of the United States" or "in violation of the Constitution or laws or treaties of the United States," or in several other respects that are not claimed to be relevant here. 28 U.S.C. § 2241(c). This case requires the Court to determine whether an individual is "in custody" within the meaning of one or both of these provisions when he is allegedly arrested and held by a foreign agent at the behest or direction of the United States.

An analysis of the "in custody" language of the habeas statute must start with the proposition that the Supreme Court has "very liberally construed the 'in custody' requirement for purposes of federal habeas." Maleng, 490 U.S. at 492; see also Peyton v. Rowe, 391 U.S. 54, 64 (1968) (holding that the "in custody" requirement of the habeas statute "should be liberally construed" because of the remedial goals of the statute). In fact, the Court has explained that

although the habeas statute limits "its availability to those 'in custody,' the statute does not attempt to mark the boundaries of 'custody' nor in any way other than by use of that word attempt to limit the situations in which the writ can be used."  Jones v. Cunningham, 371 U.S. 236, 243 (1963); see also Hensley, 411 U.S. at 350 ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty.").

When determining whether a petition falls within the "in custody" language of the habeas statute, courts must avoid "legalistic" and "formalistic" distinctions and honor the "breadth and flexibility of the Great Writ."  Morgan, 346 U.S. at 506 n.3 (quotation omitted); Chatman-Bey, 864 F.2d at 807.  The Supreme Court has often underscored the "most comprehensive character" of the habeas statute and advised that "there is no higher duty than to maintain" the writ "unimpaired."  Johnson, 393 U.S. at 485; Ex parte McCardle, 6 Wall. at 325-26; see also Burns, 346 U.S. at 148 (statement of Frankfurter, J.) ("The right to invoke habeas corpus to secure freedom is not to be confined by any a priori or technical notions of 'jurisdiction.' . . .  And so, if imprisonment is the result of a denial of due process, it may be challenged no matter under what authority of Government it was brought about.").

Although it devotes somewhat less attention to this theory than to its "immediate custodian" argument, the United States appears to contend that the statutory phrase "in custody" only encompasses cases where the individual is in the actual physical custody of a United States official.  See Resp. Show Cause at 3, 7 n.5.  The text of the statute, however, is not nearly so limiting.  Section 2241(c)(1) expressly expands the compass of habeas jurisdiction to any petitioner who is "in custody *under or by color of the authority* of the United States," not just to

those strictly in the custody of the United States.[13]  28 U.S.C. § 2241(c)(1) (emphasis added).

Section 2241(c)(3) sweeps even more broadly, encompassing any individual who is "in custody" -

- without the limitation of "under or by color of the authority of the United States" -- so long as

the custody is "in violation of the Constitution or laws or treaties of the United States."[14]  28

U.S.C. § 2241(c)(3).  No one doubts that there must be some involvement of United States

officials under either provision to satisfy the "in custody" requirement.  However, any attempt to

read a requirement that the individual be in the actual physical custody of the United States does

not find footing in the text of the statute itself.

    Indeed, consistent with the broad language in the statute, courts have universally held that

actual physical custody of an individual by the respondent is unnecessary for habeas jurisdiction to

exist.  See Justices of Boston Municipal Ct. v. Lydon, 466 U.S. 294, 300 (1984) ("Our cases make

clear that the use of habeas corpus has not been restricted to situations in which the applicant is in

actual, physical custody.") (quotation omitted); Galaviz-Medina v. Wooten, 27 F.3d 487, 492

(10th Cir. 1994) (the custody concept "includes many situations where the petitioner is not in

---

    [13]  The language in section 2241(c)(1) can be traced to the first authorization of habeas in section 14 of the Judiciary Act of 1789, which in language practically identical to the modern text authorized federal courts to issue the writ of habeas corpus to those "in custody, under or by colour of the authority of the United States, or committed for trial before some court of the same." Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82.

    [14]  Section 2241(c)(3) was first added in 1867 to expand the ambit of the writ to state prisoners.  Historians have explained that the section was phrased expansively in part to address the problem of newly freed slaves who were still held by masters under the pretext of apprenticeship laws.  See Clarke D. Forsythe, The Historical Origins of Broad Federal Habeas Review Reconsidered, 70 Notre Dame L. Rev. 1079, 1112 (1995) (habeas statute was designed to "encompass all the myriad ways in which freedmen might be 'restrained,'" including by private parties pursuant to state statutes).  In fact, in its original form, the section did not have any "in custody" requirement at all.  See Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385 (authorizing habeas relief in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States").

actual physical custody").  Courts instead have read the language of the statute to provide for

habeas jurisdiction where the official possesses either actual or "constructive" custody of the

petitioner.  See LoBue v. Christopher, 82 F.3d 1081, 1082 (D.C. Cir. 1996) (individual released

on bail pending his challenge to the federal extradition statute was "in the constructive custody of

the U.S. Marshall for the Northern District of Illinois" and therefore could "challenge the statute

through a petition for habeas corpus there"); Keefe, 222 F.2d at 392 (question of habeas

jurisdiction turns on whether the petitioner "is held in actual or constructive custody by the

respondents named in the petition, or by any other person or persons subject to the jurisdiction of

the District Court").  The Sixth Circuit has described the concept of constructive custody as

follows:

> In order to maintain a habeas corpus action, the petitioner must be "in custody."
> His custody must be the result of the respondent's action from which he seeks
> habeas corpus relief.  However, the Supreme Court has given the custody
> requirement a liberal construction, and it is not necessary that the petitioner be in
> physical control of the respondent.  It is enough that the imprisoning sovereign is
> the respondent's agent; that his liberty is restrained by the respondent's parole
> conditions; or that he can point to some continuing collateral disability which is the
> result of the respondent's action.

Steinberg v. Police Court of Albany, N.Y., 610 F.2d 449, 453 (6th Cir. 1979) (citations omitted).

There are, in fact, many circumstances in which courts have found actual or constructive

custody notwithstanding the fact that the petitioner was not in the physical custody of the

respondent government official.  These include cases where the petitioner is imprisoned in one

state and subject to a detainer in the respondent's state, see Braden, 410 U.S. at 484[15]; the

---

[15]   See also, e.g., Tinghitella v. California, 718 F.2d 308, 310 n.3 (9th Cir. 1983) ("The
district court had habeas corpus jurisdiction because the California detainer placed the petitioner
in the constructive custody of California although he was physically in custody in Texas.").

petitioner is in federal or state prison and is subject to a final order of deportation by the

respondent Immigration and Naturalization Service, see Galaviz-Medina, 27 F.3d at 493[16]; the

petitioner is on probation or parole and is restrained by conditions imposed by the respondent

officials, see Jones v. Cunningham, 371 U.S. 236, 243 (1963)[17]; the petitioner is released on his

own recognizance awaiting trial or sentencing, see Justices of Boston Municipal Ct., 466 U.S. at

300-01[18]; and the petitioner is denied entry to a tribe or to the United States but is otherwise a free

man, see Subias v. Meese, 835 F.2d 1288, 1289 (9th Cir. 1987); Poodry v. Tonawanda Band of

Seneca Indians, 85 F.3d 874, 894 (2d Cir. 1996).[19]

     In some of these cases, the petitioner was not in the physical control of the petitioner, but

was in the physical control of some other entity.  In others, the petitioner was not in the physical

_____

[16]  See Galaviz-Medina, 27 F.3d at 493 ("Since Appellant has a detainer plus a final order
of deportation against him, we must conclude that he is 'in custody' of the INS for purposes of
habeas review.").

[17]  See Jones, 371 U.S. at 243 ("While petitioner's parole releases him from immediate
physical imprisonment, it imposes conditions which significantly confine and restrain his
freedom; this is enough to keep him in the 'custody' of the members of the Virginia Parole Board
within the meaning of the habeas corpus statute. . . .").

[18]  See Justices of Boston Municipal Ct., 466 U.S. at 300-01 (holding that "a person
released on personal recognizance is in custody for purposes of the federal habeas corpus statutes"
as long as he is subjected to "restraints not shared by the public generally") (quotation omitted);
Dry v. CFR Court of Indian Offenses for Choctaw Nation, 168 F.3d 1207, 1208-09 (10th Cir.
1999) ("Although Appellants are ostensibly free to come and go as they please, they remain
obligated to appear for trial at the court's discretion.  This is sufficient to meet the 'in custody'
requirement of the habeas statute.") (citing cases).

[19]  See Jones, 371 U.S. at 239 ("This Court itself has repeatedly held that habeas corpus is
available to an alien seeking entry into the United States, although in those cases each alien was
free to go anywhere else in the world."); but see Samirah v. O'Connell, 335 F.3d 545, 549-50 (7th
Cir. 2003) (declining to hold that an individual denied entry to the United States but otherwise
with no restraints on his liberty is in the custody of the United States).

control of any entity at all.  Nevertheless, in all of these decisions, the petitioner was found to be in the actual or constructive custody of the respondent within the meaning of the habeas statute because the respondent was responsible for significant restraints on the petitioner's liberty.  See Hensley, 411 U.S. at 351 ("The custody requirement of the habeas corpus statute is designed to preserve the writ of habeas corpus as a remedy for severe restraints on individual liberty."); Poodry, 85 F.3d at 894 (habeas jurisdiction exists not just in physical custody by the executive but in all circumstances in which "federal adjudication is necessary to guard against governmental abuse in the imposition of severe restraints on individual liberty.") (quotation omitted).

Of a piece with this well-settled law are several decisions in which a court has found a petitioner to be in the actual or constructive custody of a respondent official who was working through an intermediary or an agent to detain the prisoner.  For example, in Braden, the Supreme Court held that a petitioner was "in custody" of the Commonwealth of Kentucky even though he was incarcerated by the State of Alabama, because Kentucky had issued a detainer that was being executed against the petitioner by Alabama.  In those circumstances, the Court explained, the Alabama warden was acting "as the agent of the Commonwealth of Kentucky in holding the petitioner pursuant to the Kentucky detainer," and the Court therefore had "no difficulty concluding" that petitioner was in the custody of Kentucky for purposes of a habeas petition challenging the charge underlying the Kentucky detainer.  Braden, 410 U.S. at 489 n.4; see also id. at 498-99 ("In such a case, the State holding the prisoner in immediate confinement acts as agent for the demanding State, and the custodian State is presumably indifferent to the resolution of the prisoner's attack on the detainer.").

Likewise, in United States v. Jung Ah Lung, 124 U.S. 621 (1888), the Supreme Court

found that a Chinese citizen who had been detained by the master of a steamship in San Francisco was in the custody of the United States for purposes of habeas jurisdiction.  The master explained that he had held the petitioner "in custody by direction of the customs authority of the port, under the provision of the Chinese restriction act," an Act of Congress.  Id. at 626.  The Court therefore found that the petitioner was "in custody under or by color of the authority of the United States" within the meaning of the habeas statute.  Id.

Finally, it is beyond cavil that an individual who is delivered by the executive to a private prison for detention is not stripped of his opportunity to challenge his incarceration through habeas.  See, e.g., Stokes, 374 F.3d at 1238 (Ohio federal court has habeas jurisdiction to consider habeas petition filed by individual in private prison in Ohio).  The government may not deny an individual his right to challenge the legality of his conviction by shipping that individual to a private prison, and the private party is acting under color of state law after it receives the prisoner.  Skelton v. Pri-Cor, Inc., 963 F.2d 100, 102 (6th Cir. 1991) ("To act 'under color' of law does not require that the accused be an officer of the State. . . .  There is a sufficiently close nexus between the State and the challenged action of [the private prison] so that the action of the latter may be fairly treated as that of the State itself.") (quotation and alteration omitted).

In summary, then, given the accepted breadth of the habeas statute, the imperative to construe the "in custody" requirement expansively in favor of the petitioner and without regard for formalisms, the absence of any language in the text that carves out an exception where the physical custodian is a foreign body, the many circumstances in which habeas jurisdiction has been found where the individual was not in the immediate possession of the respondent, and the decisions in which habeas jurisdiction was found when the executive or some other government

official was working through the intermediary of a State (<u>Braden</u>), a private individual (<u>Jung Ah Lung</u>) or a private corporation (<u>Stokes</u>), the Court cannot find any basis <u>in the habeas statute</u> for denying jurisdiction merely because the executive is allegedly working through the intermediary of a foreign ally.  To be sure, there are important distinctions between domestic bodies and foreign states that place considerable limitations on the inquiry (and authority) of a United States court in this setting.  That work, however, must be done by principles of separation of powers and related considerations (to which the Court will turn in a moment), not by the text of the statute itself, which draws no such distinctions.

One final point bears emphasis here.  At this time, the Court is concerned with its *jurisdiction* to entertain the habeas petition of Abu Ali, not with the *merits* of the habeas petition itself.  As Justice Scalia has explained, "a federal habeas court has jurisdiction over any claim that a prisoner is 'in custody in violation of the Constitution or laws' of the United States.  While that jurisdiction does require a claim of legal error in the original proceedings, it is otherwise sweeping in its breadth."  <u>Withrow v. Williams</u>, 507 U.S. 680, 715 (1993) (Scalia, J., concurring and dissenting) (citation omitted).  Therefore, it would be a somewhat strained reading of section 2241(c)(3) in particular that would require the United States to play a significantly greater role in an individual's detention for purposes of the Court's *jurisdiction* than would be necessary to support a claim *on the merits* that the petitioner is "in violation of the Constitution, laws, or treaties of the United States."[20]

_____

[20]  <u>See</u> <u>also</u> <u>Burns</u>, 346 U.S. at 149 ("[W]e are dealing with habeas corpus applicants who assert -- rightly or wrongly -- that they have been imprisoned and sentenced to death as a result of proceedings which denied them basic rights guaranteed by the Constitution.  The federal civil courts have jurisdiction over such applicants."); <u>Ex parte McCardle</u>, 6 Wall. at 325-26 ("This legislation is of the most comprehensive character.  It brings within the *habeas corpus* jurisdiction of every court and of every judge every possible case of privation of liberty contrary to the

As reviewed earlier, petitioners in this case have pled at least a colorable claim that Abu Ali is being held "in violation of the Constitution, laws, or treaties of the United States."  They allege that the United States has worked through Saudi officers to detain Abu Ali -- a United States citizen -- indefinitely without due process of law.  As the D.C. Circuit explained sitting en banc, "teaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the *United States* officials' unlawful acts."  Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1506-09 (D.C. Cir. 1984) (en banc) (emphasis in original), rev'd on other grounds, 471 U.S. 1113 (1985).[21]  This is not to say that petitioners will be able to prove a constitutional violation; or even that they will be able to demonstrate following jurisdictional discovery that they are in the actual or constructive custody of the United States.  It is merely to note that petitioners' unrebutted pleadings allege detention "in violation of the Constitution, laws, or treaties of the United States" for purposes of section 2241(c)(3).  See Rasul, 124 S. Ct. at 2698 ("Petitioners contend that they are being held in federal custody in violation of the laws of the United States.  No party questions the District Court's jurisdiction over petitioners' custodians.  Cf.

_____

National Constitution, treaties, or laws.  It is impossible to widen this jurisdiction.").

[21]  See also Reid, 354 U.S. at 6 (Fifth and Sixth Amendments protect United States citizens abroad); United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992) ("constitutional requirements may attach in two situations:  (1) where the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials; or (2) where the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials"); United States v. Karake, 281 F. Supp. 2d 302, 308 (D.D.C. 2003) ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); Berlin Democratic Club v. Rumsfeld, 410 F. Supp. 144, 155 (D.D.C. 1976) (holding that involvement of United States officials in the electronic surveillance by German officials of United States citizens in Germany raises constitutional concerns).

Braden, 410 U.S., at 495[], 93 S. Ct. 1123.  Section 2241, by its terms, requires nothing more.").[22]

### C.     Constitutional Considerations

The relevant text of the habeas statute, therefore, fully supports jurisdiction here.  As was

discussed earlier, however, and as hardly needs repeating, the writ of habeas corpus "commands

general recognition as the essential remedy to safeguard a citizen against imprisonment by State or

Nation in violation of his constitutional rights."  Morgan, 346 U.S. at 506 n.3 (quotation omitted).

Consistent with this principle, the Supreme Court has identified a constitutional component to the

right of a United States citizen to file a habeas petition, one that favors a liberal construction of

the habeas statute to avoid constitutional doubt, and one that might even in certain circumstances

fill any gaps in the habeas statute that would leave an unconstitutional detention of a United States

citizen without any redress.  Were there any ambiguity as to the habeas jurisdiction of this Court

here, these constitutional considerations would also weigh strongly in favor of jurisdiction.

A constitutional right to habeas for United States citizens was first suggested in Johnson v.

Eisentrager, 339 U.S. 763 (1950).  Petitioners in that case were German citizens who were

captured by United States forces in China, tried and convicted of war crimes by an American

military commission headquartered in Nanking, and incarcerated in the Landsberg Prison in

---

[22]  The Supreme Court in Rasul explained that the allegations of the Guantanamo Bay
detainees that they had been unlawfully "held in Executive detention for more than two years . . .
without access to counsel and without being charged with any wrongdoing -- unquestionably
describe 'custody in violation of the Constitution or laws or treaties of the United States'" within
the meaning of section 2241(c)(3).  Id. at 2697 n.15.  The United States has taken the view, in its
filings regarding the habeas petitions of the Guantanamo Bay detainees presently before judges of
this Court, that this language is not an assessment by the Supreme Court of the merits of the
petitioners' claims, but instead "merely conveys that the pleading requirements for jurisdiction
under 28 U.S.C. § 2241(c)(3) had been met."  Resp'ts' Reply Mem. Supp. Mot. Dismiss at 1, In re
Guantanamo Detainee Cases (D.D.C.).  Although there is an obvious dispute in this case over
whether the detention is by the executive, petitioners have otherwise pled a violation of rights very
similar to that sufficient to establish jurisdiction even under the United States' reading of Rasul.

occupied Germany.  The D.C. Circuit had concluded that there was jurisdiction in the district

court to consider the habeas claims of the German citizens, reasoning that "if a person has a right

to a writ of habeas corpus, he cannot be deprived of the privilege by an omission in a federal

jurisdictional statute."  Eisentrager v. Forrestal, 174 F.2d 961, 965 (D.C. Cir. 1949).  The D.C.

Circuit therefore resorted to "fundamentals," stating:

> if it be held that no court has jurisdiction to issue a writ of habeas corpus upon
> petition of a person confined outside the territorial United States, the ruling would
> deny the protection of the Constitution to citizens of the United States confined
> abroad by action and in custody of officials of the United States.  The only escape
> from that conclusion would be to distinguish between citizens and aliens.  We
> think that the constitutional prohibitions apply directly to acts of Government, or
> Government officials, and are not conditioned upon persons or territory.

Id.[23]

The Supreme Court reversed.  The Court explained that it was "confronted with a decision

whose basic premise is that these prisoners are entitled, as a constitutional right, to sue in some

court of the United States for a writ of habeas corpus."  339 U.S. at 777.  The Court explained that

the right to habeas rests on an "ascending scale," with citizens at the highest point and the rights of

aliens descending from there on the basis of several variables.  Id. at 770.  "With the citizen we

are now little concerned," the Eisentrager Court noted, "except to set his case apart as untouched

by this decision and to take measure of the difference between his status and that of all categories

---

[23]  The D.C. Circuit in Eisentrager also anticipated the modern exception to the
"immediate custodian" rule by explaining that "when a person is deprived of his liberty by the act
of an official of the United States outside the territorial jurisdiction of any District Court of the
United States, that person's petition for a writ of habeas corpus will lie in the District Court which
has territorial jurisdiction over the officials who have directive power over the immediate jailer."
174 F.2d at 966.  The court rested this holding on an expansive definition of "in custody" in the
habeas statute:  "We perceive nothing singular in the application of judicial authority to those who
have directive power, if such application is the only means of enforcing the prohibitive clauses of
the Constitution."  Id. at 967.

of aliens." Id. at 769.  Eisentrager then concluded that a military prisoner is not "constitutionally

entitled to the writ" where, as in that case, "(a) he is an enemy alien; (b) has never been or resided

in the United States; (c) was captured outside of our territory and there held in military custody as

a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United

States; (e) for offenses against laws of war committed outside the United States; (f) and is at all

times imprisoned outside the United States."  Id.

　　　　Each of the three opinions in Rasul considered the reasoning of Eisentrager at length.  The

majority opinion concluded that Eisentrager had implicitly held that there was no jurisdiction

under the habeas statute, and therefore had turned to "fundamentals" to assess whether there was a

constitutional right to habeas.  Rasul, 124 S. Ct. at 2694.  "Because subsequent decisions of this

Court have filled the statutory gap that occasioned Eisentrager's resort to fundamentals," the

majority explained, "persons detained outside the territorial jurisdiction of any federal district

court no longer need rely on the Constitution as the source of their right to federal habeas review."

Id. (quotation omitted).

　　　　Justice Kennedy, in his concurring opinion, opined that Eisentrager itself provides a

framework for the analysis of habeas jurisdiction.  Reading Eisentrager to hold that "citizenship

provides a longstanding basis for jurisdiction, and among aliens physical presence within the

United States also 'gave the Judiciary power to act,'" id. (quoting Eisentrager, 339 U.S. at 769)

(Kennedy, J., concurring), Justice Kennedy would have applied the six factors identified by

Eisentrager to conclude that there was jurisdiction over the habeas petitions of the non-resident

aliens held at Guantanamo Bay, id. at 2699.

　　　　Finally, the dissent in Rasul viewed both the D.C. Circuit and the Supreme Court in

Eisentrager as undertaking a statutory analysis that was guided by the canon of constitutional avoidance.  See id. at 2702 (Scalia, J., dissenting).  The dissent explained that the holding of the Supreme Court in Eisentrager that there was no statutory right to jurisdiction for non-resident aliens even accounting for constitutional considerations controlled the question of the right to habeas for the detainees in Guantanamo Bay.  See id.  The dissent emphasized, however, that the "constitutional doubt that the Court of Appeals had erroneously attributed to the lack of habeas for an alien abroad might indeed exist with regard to a *citizen* abroad -- justifying a strained construction of the habeas statute, or (more honestly) a determination of constitutional right to habeas."  Id. at 2705 (emphasis in original).

Each of the opinions in Rasul, then, held -- or at a minimum indicated -- that a United States citizen has a right to habeas that flows in some degree from the Constitution.  The majority decision recognized that Eisentrager had resorted to constitutional fundamentals to fill the gaps in the habeas statute.  The concurring decision viewed Eisentrager as holding that there is an inherent judicial authority to grant habeas relief and that "citizenship provides a longstanding basis for jurisdiction."  And the dissent suggested that there "might indeed exist" a constitutional dimension to the right of habeas for a citizen abroad, one that either would inform an analysis of the statute or "more honestly" would stand alone as a constitutional basis for habeas jurisdiction.

Even the United States has recently acknowledged that a citizen has a constitutional right to file a habeas petition that extends beyond the reaches of the statute.  Although it argued in Rasul that there was no statutory habeas jurisdiction for the non-resident alien detainees at Guantanamo Bay, the United States acknowledged several times during oral arguments that the courts would have jurisdiction over the petitions of a United States citizen at Guantanamo because

of the unique "constitutional circumstances" of citizens and the "enhanced respect" they were

afforded under <u>Eisentrager</u>.[24]  These statements do not control the result in this case, of course; the

circumstances of this petition are far removed from those of a United States citizen detained at

Guantanamo.  Nonetheless, it would appear that it was the position of the United States as

recently as this year that a United States citizen possesses a constitutional right to habeas even

where habeas jurisdiction is lacking under the habeas statute.[25]

        The Court need not rely on a constitutional right to habeas to resolve the threshold

jurisdictional question in this case.  The Court observes merely that, to the extent there is any

ambiguity in the "custody" requirement, <u>Eisentrager</u> and <u>Rasul</u> counsel at the very least that the

habeas statute should be interpreted expansively to avoid the constitutional question whether a

citizen of the United States would be deprived of his constitutional rights if he were denied any

_____

        [24]  <u>See</u> Tr. of Oral Argument in <u>Rasul v. Bush</u>, Apr. 20, 2004, <u>available at</u> 2004 WL
943637, at *22-*23 ("Question:  What if one of the Plaintiffs were an American citizen here,
being held at Guantanamo. . . . General Olson:  We would acknowledge that there would be
jurisdiction . . . --  Question:  Why?  General Olson:  --under the Habeas Corpus Statute for the
reasons that are explained in Eisentrager itself, that citizenship is a foundation for a relationship
between the nation and the individual and a foundation for--"); <u>id.</u> at *23-*24 ("Question:  What if
the American citizen was in the middle of the battlefield in Iraq?  General Olson:  We would still
argue that the jurisdiction under the habeas statute would not extend under these circumstances to
a wartime situation, Justice Stevens, but that the--what the <u>Eisentrager</u> Court said, that there is
enhanced respect with respect to the power of the Court under the habeas court jurisdiction with
respect to questions involving citizenship."); <u>id.</u> at *33 ("General Olson:  Our answer to that
question, Justice Souter, is that citizens of the United States, because of their constitutional
circumstances, may have greater rights with respect to the scope and reach of the Habeas Statute
as the Court has or would interpret it.").

        [25]  Both the majority and dissent in <u>Rasul</u> relied on this position in reaching their
respective conclusions.  <u>See Rasul</u>, 124 S. Ct. at 2696 (emphasizing that respondents "themselves
concede that the habeas statute would create federal-court jurisdiction over the claims of an
American citizen held at the base"); <u>id.</u> at 2696 (Scalia, J., dissenting) ("Neither party to the
present case challenges the atextual extension of the habeas statute to United States citizens held
beyond the territorial jurisdictions of the United States courts.").

opportunity whatsoever to challenge the legality of a detention alleged to be at the behest of the executive.  It bears mention that of the six factors that Eisentrager identified as relevant to the constitutional inquiry, all but one favor a right to habeas in this case.  Unlike in Eisentrager, Abu Ali is a citizen of the United States; he has resided in the United States for most of his life; he was not convicted by a United States military commission; he is not being held in military custody as a prisoner of war; and he was never tried for offenses against laws of war committed outside the United States (indeed, he has not been tried for any offenses at all).  See Rasul, 124 S. Ct. at 2700 (Kennedy, J., concurring) (fact that petitioner is "being held indefinitely, and without benefit of any legal proceeding," weighs in favor of habeas jurisdiction).  The only factor present in Eisentrager that is also present in this case is that Abu Ali has "at all times been imprisoned outside the United States," but as discussed earlier, that alone does not suffice to deny habeas jurisdiction to a United States citizen.

One final atextual consideration that further supports habeas jurisdiction in this case is the allegation that respondents are deliberately shielding Abu Ali from constitutional scrutiny by keeping him outside the United States.  See, e.g., Petition ¶¶ 1-5.  There is at least some factual information in the record to support this claim, including the fact that similarly situated citizens were returned to the United States to be indicted and tried in federal court, the contention that United States officials have told petitioners that a grand jury refused to return an indictment against him; and the allegation, weak as it is on the evidence in the current record, that petitioner has been tortured to obtain information and that the United States is aware of this torture.  It is well-established that "the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in

those tribunals." Alabama Great S. Ry. Co. v. Thompson, 200 U.S. 206, 218 (1906); see also

Maturo, 982 F.2d at 61 (citing cases suppressing evidence in criminal cases where "cooperation

between the United States and foreign law enforcement agencies is designed to evade

constitutional requirements applicable to American officials").

That principle distinguishes this case from the circumstance where the United States

requests that a foreign government extradite a citizen to the United States.  On the issue of

whether there is habeas jurisdiction in that setting, the Court expresses no opinion.  An obvious

distinction between the extradition context and the present situation, however, is that when an

individual is extradited to the United States, following the extradition he will have a full

opportunity to assert his rights in a United States court.  In the present case, just the opposite is

true:  The United States is alleged to be taking steps that specifically deny Abu Ali an opportunity

to "sue in the Federal courts for the protection of [his] rights." Alabama Great S. Ry. Co., 200

U.S. at 218.

Therefore, this case is not at all like United States v. Sinclair, 702 F. Supp. 477 (D. Del.

1989), where the court held that it lacked jurisdiction to consider the habeas petition of an

individual arrested by British authorities pursuant to a United States demand for his extradition to

this country, after he had been tried and convicted for mail fraud but then fled the country.  Here,

a citizen is allegedly being detained at the direction of the United States in another country

without any opportunity at all to vindicate his rights.  As the cases in this section suggest, if true,

this is an exceptional situation that demands particular attention to the rights of the citizen. See

Hamdi, 124 S. Ct. at 2650 ("[I]t would turn our system of checks and balances on its head to

suggest that a citizen could not make his way to court with a challenge to the factual basis for his

detention by his government, simply because the Executive opposes making available such a challenge."); Eisentrager, 339 U.S. at 795 (Black, J., dissenting) ("The Court is fashioning wholly indefensible doctrine if it permits the executive branch, by deciding where its prisoners will be tried and imprisoned, to deprive all federal courts of their power to protect against a federal executive's illegal incarcerations.").

### III.  Hirota and Keefe

Respondents attempt to rebut the statutory and constitutional arguments for habeas jurisdiction by claiming that the result here is determined by the decisions in Hirota v. General of the Army MacArthur, 338 U.S. 197 (1948) (per curiam), and Keefe v. Dulles, 222 F.2d 390 (D.C. Cir. 1954).  Those decisions, however, do not remotely stand for the proposition that a United States citizen in the hands of a foreign government has no right to file a petition for habeas corpus regardless of the involvement of the United States in his ongoing detention.

In Hirota, the Supreme Court rejected the habeas petition filed on behalf of several Japanese citizens who had been convicted and sentenced by a military tribunal in the aftermath of World War II.  See 338 U.S. at 198.  Although Japan at the time was "occup[ied] and control[led]" by the United States, the Court explained that the tribunal was a construct of the Allied Powers and not a court of the United States.  Id.  The Court therefore concluded, in a brief per curiam opinion, that it had no authority to set aside the judgments and sentences of the tribunal, and therefore dismissed the habeas petition.  See id.

The United States can hardly rely on a decision involving non-resident aliens challenging the sentence of a foreign military tribunal as controlling precedent for a rule that citizens lack any rights in habeas to challenge their detention (without charges, much less convictions) by a foreign

government allegedly at the behest of the United States.  The differences between the rights of

citizens and the rights of aliens are considerable in this context, and the Supreme Court has

expressly declined to enter the debate on the rights of citizens to habeas in cases involving the

rights of aliens.  As the Court explained in Eisentrager fewer than two years after its decision in

Hirota:

> With the citizen we are now little concerned, except to set his case apart as
> untouched by this decision and to take measure of the difference between his status
> and that of all categories of aliens.  Citizenship as a head of jurisdiction and a
> ground of protection was old when Paul invoked it in his appeal to Caesar.  The
> years have not destroyed nor diminished the importance of citizenship nor have
> they sapped the vitality of a citizen's claims upon his government for protection.

339 U.S. at 768; see also Hamdi, 124 S. Ct. at 2647 ("We reaffirm today the fundamental nature

of a citizen's right to be free from involuntary confinement by his own government without due

process of law . . . ."); Rasul, 124 S. Ct. at 2705 (Kennedy, J., concurring) (Eisentrager recognized

an "ascending scale of rights" with "[c]itizenship provid[ing] a longstanding basis for

jurisdiction") (quotation omitted); id. at 2706 (Scalia, J., dissenting) ("Neither party to the present

case challenges the atextual extension of the habeas statute to United States citizens held beyond

the territorial jurisdictions of the United States courts; but the possibility of one atextual exception

thought to be required by the Constitution is no justification for abandoning the clear application

of the text to a situation in which it raises no constitutional doubt.").

The United States has itself recently acknowledged the important differences with regard

to habeas jurisdiction between the rights of a citizen and the rights of a non-resident alien.  See id.

at 2696 ("Respondents themselves concede that the habeas statute would create federal-court

jurisdiction over the claims of an American citizen held at the base.").  The precise nature of the

differences in the rights of citizens and aliens need not be decided here.  It suffices to recognize

that in determining the rights of certain non-resident aliens to challenge the judgment of a foreign

military tribunal in a brief per curiam opinion in Hirota two years prior to Eisentrager, it is

inconceivable that the Supreme Court also intended to rule that a citizen will not have any rights

in the circumstances alleged here.

Petitioners also rely heavily on Keefe v. Dulles, a case that at least involved an American

citizen.  Keefe was a private in the United States army stationed in France who had pled guilty to

a charge that he had beaten a cab driver and stolen his taxi.  See 222 F.2d at 391.  He was serving

a five year sentence in French prison pursuant to the sentence of a French court.  Id.  Keefe's wife

filed a habeas petition against several United States officials challenging the failure of the officials

to obtain his release.  The court assumed that the only role the United States was alleged to have

played in the case was in "not preventing the French from taking, trying, convicting, and confining

him."  Id.  The court then framed the relevant legal question as "whether Keefe is held in actual or

constructive custody by the respondents named in the petition, or by any other person or persons

subject to the jurisdiction of the District Court."  Id. at 392.  In a brief, two-sentence discussion,

the court concluded that his detention by French authorities meant that Keefe was not in the

custody of the respondents, or any other individual within the jurisdiction of the federal courts,

and therefore denied the habeas petition.  See id.

The holding in Keefe that there was no "custody or constructive custody" where the only

involvement of the United States is assumed to be its refusal to intervene on behalf of a citizen

held by a foreign government can hardly be read as precedent for the notion that there can never

be "custody or constructive custody" even if (as petitioners allege here) the United States is

actively involved in arranging the arrest and ongoing detention of a citizen.  The result in Keefe is

-46-

unassailable.  If the mere failure of the United States to exercise its diplomatic powers to obtain the release of a citizen held in a foreign prison sufficed to vest habeas jurisdiction in a United States court, there would be jurisdiction in practically every case in which a citizen is imprisoned in a foreign land, even if (as was assumed in Keefe) the United States was not involved in the detention at all.  To read Keefe to also hold *sub silentio* that habeas jurisdiction can never exist even if the United States actively works to separate a citizen from his constitutional rights is to read far more into the two-sentence discussion in Keefe than it can plausibly support.

The cursory analysis in Hirota and Keefe simply cannot sustain the broad immunity the United States seeks here from habeas actions filed by citizens.  It is worth adding that to the extent Hirota and Keefe provide even marginal support for the position advanced by the United States, more than five decades of intervening law has transpired since those cases were decided, during a time of great change in habeas jurisprudence.  Hirota not only pre-dated Eisentrager, but both Hirota and Keefe also pre-date Braden and Rasul and the narrowing of the "immediate custodian" rule.  Hirota and Keefe arose at a time when, as the Supreme Court explained in Rasul, the prisoner's presence in the territorial jurisdiction of the district court was an "invariable prerequisite" to the exercise of district court jurisdiction.  Rasul, 124 S.Ct. at 2694-95 (quotation omitted).  The point is not so much that interceding cases have overruled Hirota and Keefe, but rather that any attempt to tease a broad jurisdictional bar out of the brief discussion and narrow facts of either decision must account for the jurisdictional backdrop against which they were decided.  See generally Chapman-Bey, 864 F.2d at 809 ("The modern history of habeas corpus is a story of steady expansion of the Great Writ . . . ."); Fuller v. I.N.S., 144 F. Supp. 2d 72, 85 (D. Conn. 2000) ("The traditional strict custody requirement has been greatly expanded over the last

several decades, as 'stifling formalisms' and 'arcane and scholastic procedural requirements' have given way.").[26]

## IV.    The Act of State, Separation of Powers, and Political Question Doctrines

Unable to find support for the rule they propose in either the text of the habeas statute or controlling precedent, the United States appeals to three weighty principles: the act of state, separation of powers, and political question doctrines.  Each is an important consideration in this case.  None, however, extinguishes the fundamental right of a citizen to challenge his detention colorably alleged to be at the behest of the executive.

### A.    Act of State

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory."  Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964).  "Act of state issues only arise when a court *must decide* -- that is, when the outcome of the case turns upon -- the effect of official action by a foreign sovereign."  W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l, 493 U.S. 400, 407-10 (1990) ("Kirkpatrick") (emphasis in original).  Respondents maintain that the habeas petition implicates the act of state doctrine because it calls into question the motivations of the Saudi government in detaining Abu Ali and implies that the Saudi

---

[26] There is yet another distinction between Hirota and Keefe and the present case.  In both Hirota and Keefe, there was a judgment and sentence by a foreign tribunal.  As Hirota explained, a United States court has "no power or authority to review, to affirm, set aside or annul the judgments and sentences imposed" by a foreign tribunal.  338 U.S. at 198.  Here, there is no tribunal at all.  The act of a foreign state in arresting an individual, entering judgment against him, and sentencing him in a court of law is of a different order altogether than the decision by the executive to hold him through the intercession of another country.  The former acts require the United States courts to sit as a court of appeals over the court of a former country.  The latter is an act by the executive that is readily susceptible to consideration by a United States tribunal and does not require review of a decision of a foreign tribunal.

government is a "puppet" that will "do the bidding" of the United States.  See Resp'ts'
Supplemental Filing at 3; Resp'ts' Opp'n Mot. Prelim. Inj. at 16.

      For several reasons, respondents' reliance on the act of state doctrine is misplaced.  At least
two of those reasons are highlighted by the Supreme Court's decision in Kirkpatrick.  There, the
Court considered a claim brought by one company against a competitor under the RICO Act and
the Robinson-Patman Act claiming that the rival had obtained a government contract with the
Republic of Nigeria by offering bribes to Nigerian officials.  The defendants argued that the suit
was barred by the act of state doctrine because to prevail on its claims, the plaintiff would have to
prove facts that would call into question the legality of the Nigerian officials' actions and
embarrass the Nigerian government.  In a unanimous decision, the Supreme Court concluded that
the doctrine had no application to the case.

      The Court first addressed the defendants' argument that the plaintiff would have to prove
that Nigerian officials received bribes in order to prevail, a finding that would suggest the
illegality of the contract.  The Court reasoned that regardless of "what the [lower] court's factual
findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question
to be decided." Id. at 406.  "Nothing in the present suit," the Court explained, "requires the Court
to declare invalid, and thus ineffective as a rule of decision for the courts of this country, the
official act of a foreign sovereign." Id. (quotation omitted).

      Kirkpatrick contrasted the suit before it with Underhill v. Hernandez, 168 U.S. 250, 254
(1897), in which the act of state doctrine was found to apply to a tort action brought by the
plaintiff against a foreign military official for unlawfully detaining him during a revolution in
Venezuela.  Kirkpatrick explained that a holding that the detention was tortious "would have

required a court in the United States to declare invalid" and deny "legal effect to acts of a military commander representing the . . . government."  493 U.S. at 405 (quotation omitted).  By contrast, Kirkpatrick explained, the plaintiff in the case before it was not attacking the legality of the conduct of a foreign government, but instead was challenging the acts of a third party in "obtaining" or "procur[ing]" the conduct.  See Kirkpatrick, 493 U.S. at 406-07.  __

       Kirkpatrick cited favorably to an earlier decision of the Court holding that "the defendant's actions in obtaining Mexico's enactment of 'discriminating legislating' could form part of the basis for suit under the United States antitrust laws."  Id. at 407 (quoting United States v. Sisal Sales Corp., 274 U.S. 268, 276 (1927)).  Likewise, Kirkpatrick explained, the plaintiff in the case before it was challenging the defendants' actions in procuring certain conduct by a foreign government, not the conduct of the foreign government itself.  Id.  At most, such a suit "may cast doubt upon the validity of foreign sovereign acts," but it would not require the court to hold those acts invalid.  Id. at 406-07.

       The Court then turned to the defendants' contention that, even if the acts of a foreign state were not being directly challenged, "a determination that Nigerian officials demanded and accepted a bribe would impugn or question the nobility of a foreign nation's motivations and would result in embarrassment to the sovereign."  Id. at 408 (quotation omitted).  Again emphasizing that the act of state doctrine applies only where the act of a foreign sovereign would be "invalidated," not just "impugned," id. at 407, the Court explained that the "act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid.  That doctrine has no application to the

present case because the validity of no foreign sovereign act is at issue," id. at 409-10.

In its present posture, this case maps onto Kirkpatrick. Petitioners are not challenging the legality of the actions of the Saudi government in tort or otherwise, see Underhill, but rather suing non-foreign entities -- here, United States officials -- for the role they allegedly played in obtaining the actions of the Saudi government, see Kirkpatrick. The "validity" or "legality" of the Saudi detention is not at issue; rather, the issue is whether the United States ran afoul of its constitutional obligations to Abu Ali in "obtaining" the detention from the Saudis. This inquiry might cast doubt on the integrity of the acts of Saudi officials, but that does not require the Court to declare invalid or illegal any such act.[27] Respondents instead emphasize that the suit might embarrass the Saudi government by suggesting that it is the "puppet" of the United States. Kirkpatrick makes clear that this concern does not implicate the act of state doctrine.[28] See also Lamb v. Philip Morris, Inc., 915 F.2d 1024, 1026 (6th Cir. 1990) (reading Kirkpatrick to hold that "the act of state doctrine does not bar a court in the United States from entertaining a cause of action that . . . requires imputing to foreign officials an unlawful motivation (the obtaining of

---

[27] It is not entirely clear what it would mean for Saudi acts to be declared "illegal" in this context; unlike even in Kirkpatrick, where it was undisputed "that Nigerian law prohibits both the payment and the receipt of bribes in connection with the award of a government contract," id. at 401-02, there has been no claim that Saudi officials would be in violation of Saudi Arabia or United States law were they found to be holding Abu Ali at the behest of the United States.

[28] The situation in this respect is somewhat different now than it was at the preliminary injunction stage, when petitioners were asking the Court to direct the United States to tell the Saudis not to take the legal act of charging an individual with a crime. There is an important distinction  between a United States official instructing a Saudi official not to take a public act, which strikes closer to core act of state concerns, and a petition challenging specifically the role of the United States in obtaining a public act, which as Kirkpatrick instructs is at least one step removed from act of state concerns. The closer the case drifts to instructions the United States government -- either the judiciary or the executive -- must provide to the Saudi government about a legal act of the Saudi government (arrest or otherwise), the more that act of state concerns will build.

bribes) in the performance of . . . an official act") (quotation and alteration omitted).

Moreover, the assertions by the United States that this habeas petition will impugn and embarrass the Saudis seem overstated and something of a red herring. The federal reporters are filled with cases where countries detain individuals at the behest of their allies. A finding that the Saudis detained an individual at the request of the United States no more declares the Saudis a "puppet" of the United States than, as in LoBue v. Christopher, the decision of the United States to arrest two individuals in response to a request for extradition by the Canadian government indicates that the United States is a "puppet" of Canada. See LoBue, 82 F.3d at 1081. There is simply no warrant for respondents' suggestion that every instance in which the United States is discovered to have worked with another country is so embarrassing to the other country that litigation is barred under the act of state doctrine. See Ramirez de Arellano, 745 F.2d at 1542 (holding that a joint venture with foreign agents will not shield officials of the United States under the act of state doctrine from liability to citizens for the officials' acts).

Whatever limited bearing the act of state doctrine has on this case in light of the above analysis is only diminished further by the fact that the doctrine is being invoked here by the United States in an attempt to shield itself from judicial inquiry for its own allegedly unconstitutional acts against one of its citizens. The D.C. Circuit sitting en banc made this very point in Ramirez de Arellano, a case in which a United States citizen sued United States officials for their alleged role in destroying his cattle ranch in Honduras to build a military camp. The United States responded that the military camp was principally a project of the Honduran government, and invoked the act of state doctrine. Sitting en banc, the D.C. Circuit rejected the United States' reliance on the act of state doctrine, explaining:

> The Supreme Court has never applied the act of state doctrine to bar adjudication of constitutional claims by a United States citizen against officials of the *United States* government. . . .  It is highly questionable whether officials of the Executive are entitled to raise the act of state defense to prevent the Judiciary from exercising its role in the tripartite system of government to remedy injuries to United States citizens caused by unconstitutional activities of the United States Executive Branch.

745 F.2d at 1542 (emphasis in original).  "A teaming up with foreign agents," the D.C. Circuit explained, "cannot exculpate officials of the United States from liability to United States citizens for the *United States* official's unlawful acts."  Id. (emphasis in original).

Respondents note that Ramirez de Arellano was reversed on other grounds by the Supreme Court, which is true as far as it goes.  This cannot possibly be read as a criticism of the act of state analysis in the decision, however -- the Supreme Court reversed because of the interceding enactment of a statute that bore on an entirely different issue in the case.[29]  Indeed, the D.C. Circuit has since cited with approval the holding and reasoning in Ramirez de Arellano,[30] including its separation of powers analysis.[31]  Respondents do not offer any persuasive explanation for why this Court should simply ignore the reasoning of the decision here.

---

[29]  The Supreme Court remanded the case to the D.C. Circuit in light of the passage of the Foreign Assistance and Related Programs Appropriations Act, which authorized the use of funds for a U.S.-financed military training center in Honduras subject to specified conditions.  See Weinberger v. Ramirez de Arellano, 471 U.S. 1113 (1985).  On remand, the D.C. Circuit, again sitting en banc, dismissed the case in light of the undisputed fact that all U.S. military personnel had departed from the land in question after failing to reach an agreement with the Honduran government concerning the operation of a military training center consistent with the Act's requirements.  See de Arellano v. Weinberger, 788 F.2d 762, 763 (D.C. Cir. 1986) (en banc).

[30]  See, e.g., Transcapital Fin. Corp. v. Dir., Office of Thrift Supervision, 44 F.3d 1023, 1025 (D.C. Cir. 1995); Transohio Savings Bank v. Dir., Office of Thrift Supervision, 967 F.2d 598, 613 (D.C. Cir. 1992); Antolok v. United States, 873 F.2d 369, 381 (D.C. Cir. 1989).

[31]  See Comm'n of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 934-35 (D.C. Cir. 1988); see also Helms v. Sec'y of Treasury, 721 F. Supp. 1354, 1359-60 (D.D.C. 1989).

More to the point, however, respondents never offer any response to the reasoning of the decision itself.  In particular, they do not explain why the act of state doctrine -- a "prudential" rule of decision, see Kirkpatrick, 493 U.S. at 406; Honduras Aircraft Registry, Ltd. v. Gov't of Honduras, 129 F.3d 543, 550 (11th Cir. 1997) -- should be applied to deny a United States citizen any ability at all to challenge his incarceration allegedly at the behest of his own government.  They certainly do not cite any decision by the Supreme Court or any court of appeals that has applied the doctrine in this manner.[32]  In fact, inasmuch as the D.C. Circuit in Ramirez de Arellano held that the act of state doctrine has no bearing on a case involving the *property rights* of citizens, that reasoning can only apply with far greater force to a case implicating the *fundamental due process rights* of a citizen to be free from arbitrary and indefinite detention without charge at the direction of his own government.  See Immigration and Naturalization Service v. St. Cyr, 533 U.S. 289, 301 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest").

## B.    Separation of Powers

A similar analysis applies to petitioner's reliance on the separation of powers.  The Supreme Court has instructed that matters "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . . are so exclusively

---

[32]  Respondents place much reliance on a single district court decision in which the court found that the act of state doctrine foreclosed the habeas petition of a citizen who was arrested by Bolivian officials because jurisdiction would require a finding that the Bolivian government was a "puppet" of the United States.  See Duchow v. United States, 1995 WL 425037, at *3 (E.D. La. July 19, 1995), aff'd, 114 F.3d 1181 (5th Cir. 1997).  This Court concludes that the act of state analysis in Duchow is inconsistent with the holding of the Supreme Court in Kirkpatrick and the guidance of the D.C. Circuit sitting en banc in Ramirez de Arellano, and therefore declines to follow it.

entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Harisiades v. Shaughnessy, 342 U.S. 580, 588-89 (1952). The authority of the executive in diplomatic relations with other countries is considerable, and it will cabin the Court's inquiry moving forward and counsel caution at every step. See Holmes v. Laird, 459 F.2d 1211, 1215 (D.C. Cir. 1972) ("[T]he controlling considerations are the interacting interests of the United States and of foreign countries, and in assessing them we must move with the circumspection appropriate when a court is adjudicating issues inevitably entangled in the conduct of our international relations.") (quotation and alteration omitted)

There is simply no authority or precedent, however, for respondents' suggestion that the executive's prerogative over foreign affairs can overwhelm to the point of extinction the basic constitutional rights of citizens of the United States to freedom from unlawful detention by the executive. The competing interests of the executive to manage foreign affairs and the judiciary to protect the due process rights of citizens has never been resolved wholly in the executive's favor. See, e.g., Hamdi, 124 S. Ct. at 2650 ("[W]e have made clear that, unless Congress acts to suspend it, the Great Writ of habeas corpus allows the Judicial Branch to play a necessary role in maintaining this delicate balance of governance, serving as an important judicial check on the Executive's discretion in the realm of detentions."); Comm'n of United States Citizens, 859 F.2d at 935 ("'[T]he Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry.'") (quoting Ramirez de Arellano, 745 F.2d at 1515). Instead, "individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of other branches." 13 Wright et al., Federal Practice and

Procedure § 3534.2 at 504 (2d ed. 1984 & Supp. 2004) ("[R]espect for the political branches

affects, but does not preclude, decision on the merits.").[33]

The reasoning of the D.C. Circuit in Ramirez de Arellano is again instructive. The court

explained that the plaintiffs sought "adjudication of the narrow issue whether the United States

defendants may run military exercises throughout the plaintiff's private pastures when their land

has not been lawfully expropriated." 745 F.2d at 1500. The plaintiffs did not, the court

emphasized, "challenge the United States military presence in Honduras or in Central America,

nor do they object to United States sponsorship of a Regional Military Training Center in

Honduras." Instead, the claim was "narrowly focused on the lawfulness" of the defendants'

alleged occupation of their ranch. Id. at 1512.

As the D.C. Circuit explained it, this is a "paradigmatic issue for resolution by the

Judiciary. The federal courts historically have resolved disputes over land, even when the United

States military is occupying the property at issue." Id. More broadly, the court explained:

> While separation of powers concerns may outweigh judicial adjudication in the
> typical case involving a foreign act of state, the prudential balance may shift
> decidedly when United States citizens assert constitutional violations by United
> States officials. A balancing of the roles of the Executive and the Judiciary may
> produce a different outcome in those cases in which the Judiciary is called upon to
> curb unconstitutional excesses of *its own* Executive Branch.

Id. (emphasis in original). Of course, the alleged "excesses" are even greater here than they were

in Ramirez de Arellano.

Respondents' reliance on the act of state and separation of powers doctrines would

---

[33] Significantly, the United States does not claim that its alleged actions against Abu Ali can be justified under the President's war powers. The United States has confined its separation of powers argument to the contention that the involvement of the judiciary infringes on the power of the executive to manage the "bilateral relationship" between the United States and Saudi Arabia. See Resp'ts' Resp. Mot. Prelim. Inj. at 30.

conceivably have greater force were it not for the fact that the inquiry to be undertaken here -- a determination of the relative involvement of the United States and Saudi Arabia in the detention of a United States citizen -- is precisely the inquiry that federal courts conduct in any criminal case where a defendant alleges that evidence the United States intends to use against him was obtained by foreign governments at the behest of the United States in violation of his constitutional rights. See Karake, 281 F. Supp. 2d at 308 ("A defendant may move to suppress statements made to agents of foreign governments when the conduct of foreign law enforcement officials renders them agents, or virtual agents, of United States officials."); United States v. Yousef, 327 F.3d 56, 145 (2d Cir. 2003) ("statements elicited during overseas interrogation by foreign police in the absence of Miranda warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities").

To take one example, Judge Huvelle of this Court only a year ago held in Karake that the defendants in the case were "entitled to evidence that may demonstrate cooperation between the United States and Rwandan governments sufficient to reveal an agency relationship so that they can, if appropriate, raise constitutional challenges." 281 F. Supp. 2d at 309. She therefore ordered that the

> government must disclose any evidence it has, or can obtain by good faith efforts,
> that Rwandan officials or any other foreign officials were operating as agents of the
> United States government, including but not limited to information that defendants
> were held at U.S. officials' request or were questioned at U.S. officials' direction.

Id. at 308-09; see also, e.g., Yousef, 327 F.3d at 123 (describing the disclosure of evidence and the "thorough suppression hearing" concerning whether the United States "participated in or condoned Murad's incarceration in the Philippines and the alleged torture that occurred there"). The inquiry undertaken in Karake and similar cases is not even unique to the suppression context.

A similar inquiry is conducted in criminal cases where the defendant alleges that the district court lacks jurisdiction because he was brought into the jurisdiction of the court through abduction or torture (often allegedly by foreign officials at the direction of United States officials),[34] and in civil cases where United States citizens overseas challenge the alleged joint involvement of the United States and a foreign government in an ongoing violation of the citizens' constitutional rights that falls short of outright detention.[35]

The United States argues strenuously that *any* discovery in this case would "not possibly constitute a proper subject" of discovery and would involve the courts "in matters of the most delicate diplomacy," Resp. Show Cause at 19-20, but as Karake indicates, these are not inquiries that are unusual for the courts. As indicated earlier, the Court will proceed forward with care. See 13A Wright et al., supra, § 3534.2 at 504; see also Flynn v. Schultz, 748 F.2d 1186, 1191 (7th Cir. 1984) ("It is clear, therefore, that it is proper for this Court to consider whether the defendant's policies or actions violate the Constitution. Our review, however, must proceed fully

_____

[34] See United States v. Toscanino, 500 F.2d 267, 281 (2d Cir. 1974) (remanding to district court to hold an evidentiary hearing with respect to defendant's allegations of forcible abduction at hands of foreign officials allegedly at the behest of United States officials if defendant is able to "offer[] some credible supporting evidence . . . that the action was taken by or at the direction of United States officials"); Yousef, 327 F.3d at 138 (considering and rejecting defendant's offering under Toscanino); United States v. Lambros, 65 F.3d 698, 701 (8th Cir. 1995) (district court should make specific factual finding under Toscanino with regard to the alleged United States involvement in abduction of defendant by foreign officials); United States v. Orsini, 402 F. Supp. 1218 (E.D.N.Y. 1975) (holding hearing under Toscanino to consider defendant's sworn affidavit "setting forth . . . allegations of acts of torture, brutality, and inhumanity committed against him by or at the direction of American Agents").

[35] See Berlin Democratic Club, 410 F. Supp. at 147 (holding, in case where United States citizens in Germany challenged the alleged involvement of the United States Army in inducing German authorities to wiretap them in violation of their constitutional rights, that plaintiffs were "entitled to discovery of facts which would demonstrate that the FRG simply carries out the suggestions of the United States Army without meaningful review").

cognizant of the constitutionally committed powers of the executive in the area of foreign affairs."); United States v. Angulo-Hurtado, 165 F. Supp. 2d 1363, 1371 (N.D. Ga. 2001) ("The 'joint venture' doctrine is a purposefully limited exception, and this Circuit accordingly has set a high threshold for a defendant to invoke it."). The deference due the executive in the management of foreign relations will limit any discovery that will occur and will narrow the Court's inquiry.[36] The separation of powers cannot eliminate entirely, however, the right of a citizen to challenge his allegedly unlawful detention at the direction of the executive.

### C.    Political Question

Finally, respondents invoke the closely related political question doctrine.  "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).  The argument respondents raise is essentially the same as their separation of powers argument, and it is met with the same answer.  As one treatise explains, "the pervasive influence of political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action.  To the contrary, individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of other branches."  13A Wright et al., supra, § 3534.2 at 504.

Respondents cite to cases in which courts have held that there is no role for the judiciary in ordering the executive to take steps to obtain an accounting from Vietnam of the status of United States veterans of the Vietnam War, see Smith v. Reagan, 844 F.2d 195, 197 (4th Cir. 1988), or in

_____

[36]  In particular, act of state and separation of powers considerations may bear strongly on the nature of the relief that petitioners will be able to obtain in this action.

ordering the United States to demand the release of an American convicted in Mexico, Flynn, 748 F.2d at 1186. These are cases, however, where the plaintiffs argued that the United States was obliged under the Hostage Act to intercede on behalf of citizens who allegedly were being detained unlawfully at the hands of a foreign government. The courts concluded that the Hostage Act did not contain cognizable standards, and that the other various forms of relief sought were free-floating, without any manageable standards at all.

This case is far different. Here, petitioners challenge not the failure of the United States to act on behalf of a citizen in accordance with certain claimed statutory duties, but the United States' alleged actions against a citizen in violation of certain constitutional duties. In this setting, even these cases hold, the political question doctrine wanes. See, e.g., Smith, 844 F.2d at 198 ("Not every suit that touches on foreign relations is beyond judicial cognizance. A cause of action under the Hostage Act, however, would inescapably involve courts in matters of the most delicate diplomacy."); Flynn, 748 F.2d at 1191 (an "area concerning foreign affairs that has been uniformly found appropriate for judicial review is the protection of individual or constitutional rights from government action"; this "protection of the individual unquestionably extends to cases involving United States Government action taken against our own citizens abroad").

The charge advanced by the plaintiffs in Smith and Flynn was that "a foreign government ha[d] 'unjustly deprived' an American citizen of liberty" and that the United States was obliged to take a vaguely defined role in obtaining his release. Smith, 844 F.2d at 198. The claim here, on the other hand, is that the United States has unjustly deprived an American citizen of liberty through acts it has already taken, precisely what courts are accustomed to assessing. Although both situations involve the detention of United States citizens overseas, that is where the

similarities end.  See Baker v. Carr, 369 U.S. 186, 211 (1962) (court must undertake a "discriminating inquiry into the precise facts and posture" of each case; "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance").

At any rate, the D.C. Circuit has left little doubt that the political question doctrine will not trump the due process rights that lie at the heart of this dispute.  See Committee of United States Citizens, 859 F.2d at 934-35 (holding that claims of United States citizens living in Nicaragua that funding of the Nicaraguan contras by the United States unconstitutionally deprived them of liberty and property without due process of law "are serious allegations and not ones to be dismissed as nonjusticiable") (quotation omitted); Ramirez de Arellano, 745 F.2d at 1515 (rejecting political question defense where property rights of United States citizen are directly implicated because the "Executive's power to conduct foreign relations" cannot give the Executive "*carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry").

Hence, once again, although this case will proceed in the shadow of the political question doctrine, the right of Abu Ali to challenge his alleged detention at the behest of the executive will not be eliminated altogether by the doctrine.  Instead, bearing respondents' concerns founded in the principles of the political question, separation of powers, and act of state doctrines firmly in mind, the Court will carefully construct the future course of this proceeding.

## V.    Writ of Mandamus

Petitioners also request that the Court issue a writ of mandamus under 28 U.S.C. § 1361. See   Pet'rs' Reply Br. to Habeas Petition ¶¶ 21-22.  Section 1361 provides that the "district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

Courts interpreting section 1361 have held that a writ of mandamus may issue only where "the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must not only authorize the demanded action, but require it; the duty must be clear and undisputable." Shoshone-Bannock Tribes v. Reno, 56 F.3d 1476, 1479 (D.C. Cir. 1995) (quotation omitted).

For the source of the duty that they maintain is owed to Abu Ali, petitioners look to 22 U.S.C. § 1732, known as the Hostage Act:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war and not otherwise prohibited by law, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

22 U.S.C. § 1732. Petitioners argue that the Act gives rise to a mandatory duty on the part of the President to demand the Saudi Government to release Abu Ali.

The Court cannot agree that the Act creates any duty enforceable by a writ of mandamus. The operation of the statute depends on it being "made known to the President" that a citizen was "unjustly deprived" of his liberty. Once the President makes this determination, the statute provides that the President can demand the release of a citizen "if it appears to be wrongful"; he can use means "as he may think necessary" to obtain the release "if the release so demanded is unreasonably delayed or refused"; and all of this information "as soon as practicable" shall be communicated by the President to Congress. None of this can be regarded as ministerial. The statute is run through with discretion, starting at the very outset with the "unjustly deprived"

determination on which all of the other provisions are conditioned.

Every court to consider the statute has reached the same conclusion.  See Smith, 844 F.2d at 199-200 ("The Act's vagueness suggests that Congress intended the President to exercise broad discretion, and intended to foreclose traditional judicial review in this area.") (quotation omitted); Flynn, 748 F.2d at 1193 ("Not only would it be inappropriate for us to scrutinize the defendant under such a vague and subjective standard, but the vagueness of the term itself indicates to us that . . . Congress seems to have contemplated that the President would make a subjective judgment."); Redpath v. Kissinger, 415 F. Supp. 566, 569 (W.D. Tex. 1976) ("The official actions sought are not ministerial, but are clearly of a diplomatic nature involving the exercise of discretion by the Executive, or under his direction.").  Petitioners thus cannot look to the Hostage Act for any affirmative duty of the respondents to assist Abu Ali that is enforceable by the judiciary.  See Smith, 844 F.2d at 199 ("Accountability lies in oversight by Congress or in criticism from the electorate, but not in the judgments of the courts.  The Hostage Act sets the terms of political debate, not the standards of adjudication.  The adversary process here is more political than litigious.").[37]

One would hope that either independent from or because of the Hostage Act the United

_____

[37]  The Court is aware that Flynn, after concluding that the "unjustly deprived" determination is a subjective judgment committed to the President, and that the executive therefore bore no judicially reviewable duty under the statute to take steps to obtain the release of a citizen detained overseas, nonetheless went on to suggest that the Act "placed a judicially enforceable duty on the Executive to inquire into the circumstances of an American citizen's extended detention abroad."  Flynn, 748 F.2d at 1195.  This Court believes that this is a misreading of the statute.  As Flynn held, and this Court agrees, the determination of "unjustly deprived" is committed to the executive.  See id. at 1194 ("any duty under § 1732 is contingent upon the preliminary determination of 'unjustly deprived' since this Court cannot make that determination itself").  There is no basis for the Court to issue a writ of mandamus for any duty that is conditioned on that determination, including the duty of inquiry.

States would make reasonable inquiry of a foreign government as to the reasons for the imprisonment of a United States citizen, and take any appropriate diplomatic follow-up to the response obtained.  Indeed, it may be that such events have transpired here.  But the question before the Court is not whether such diplomatic inquiries and actions are wise or appropriate, but whether they are clearly and indisputably compelled by the Act.  The Court concludes that no such enforceable duty is created by the statute.

**VI.     Jurisdictional Discovery**

Petitioners have not only alleged, but have presented some unrebutted evidence, that Abu Ali's detention is at the behest and ongoing direction of United States officials.  Specifically, petitioners have alleged and introduced at least some evidence suggesting that (i) the United States initiated the arrest of Abu Ali in Saudi Arabia; (ii) the United States has interrogated Abu Ali in Saudi Arabia; (iii) the United States is controlling events in Saudi Arabia; (iv) the United States is keeping Abu Ali in Saudi Arabia to avoid constitutional scrutiny by American courts; (v) Saudi Arabia would immediately release Abu Ali to United States officials upon a request by the United States government; and (vi) Abu Ali has been subjected to torture with the knowledge of the United States.

The evidence that petitioners have supplied to the Court to date can be characterized as considerable in light of the unavailability of Abu Ali himself, and the location of most of the remainder of the information regarding Abu Ali's detention in the hands of the United States or the Saudi governments.  Petitioners have filed affidavits in which they relate their conversations with several named United States officials, copy verbatim cables and emails that have been shown to them, and describe in detail the extrinsic evidence of the nature of Abu Ali's detention

(including newspaper articles in which reporters queried Saudi officials), their conversations with Abu Ali and Saudi officials, and information they have received from their political representatives. This evidence stands unrebutted, as respondents have chosen not to engage petitioners on their factual contentions.

Still, some of the evidence petitioners identify in their affidavits is not sufficiently competent by itself to serve as the basis for a judicial determination of jurisdiction. For example, discussions with  Saudi officials familiar with the case or eyewitnesses to Abu Ali's detention who not only fail to come forward with their own affidavits, but whom petitioners decline to name, are not particularly persuasive. Other evidence consists of the petitioners' accounts of things that were told to them by their attorneys (relating conversations those attorneys allegedly had with the government) or by defendants in the Royer case or by others; these individuals are as available to petitioners as they are to the United States, and petitioners would do well to obtain competent evidence from the individuals themselves. Petitioners' documentation also occasionally refers to letters or other materials that should, by the account of petitioners, be in their possession, but that they have not submitted to the Court.

Nonetheless, much of the strongest evidence submitted by petitioners consists of conversations they and their supporters claim to have had with various agents of the United States. Petitioners have identified in their papers specific individuals -- members of the Federal Bureau of Investigation, the State Department, the United States Attorney's Office, and others -- whom petitioners say communicated information that is directly relevant to the question of the involvement of the United States in Abu Ali's detention. These individuals are United States officials under the control of respondents who can speak to the specific question of the

involvement of the United States in the detention without injecting this Court into discovery from Saudi officials. As indicated earlier, although the discovery will be limited by considerations of the separation of powers, the legal questions at issue in this case and the discovery they necessitate are not unique, or even uncommon, for the federal judiciary.

The evidence in the record at this stage certainly is not sufficient for this Court to deny habeas jurisdiction, but neither is it sufficient conclusively to find habeas jurisdiction in the circumstances of this case. The jurisdiction of this Court requires a finding that Abu Ali is in the actual or constructive custody of the United States. The case law indicates that this inquiry will entail a consideration of several factors, including whether: (i) Abu Ali was detained at the behest of United States officials[38]; (ii) his ongoing detention is at the direction of the United States enlisting a foreign state as an agent or intermediary who is indifferent to the detention of the prisoner[39]; (iii) he is being detained in the foreign state to deny him an opportunity to assert his rights in a United States tribunal[40]; and (iv) he would be released upon nothing more than a request by the United States.[41]

Any one of these factors may not be sufficient to establish jurisdiction. Cf. Yousef, 327 F.3d at 146 ("[E]vidence that the United States may have solicited the assistance of a foreign

---

[38] See, e.g., Jung Ah Lung, 124 U.S. at 626; Eisentrager, 174 F.2d at 967; Karake, 281 F. Supp. 2d at 308.

[39] See, e.g., Braden, 410 U.S. at 488; Steinberg, 610 F.2d at 453; Karake, 281 F. Supp. 2d at 308; Berlin Democratic Club, 410 F. Supp. at 147.

[40] See, e.g., Alabama Great Southern, 200 U.S. at 218; Johnson, 339 U.S. at 795 (Black, J., dissenting); Yousef, 327 F.3d at 145-46.

[41] See, e.g., 28 U.S.C. § 2243 ("[T]he person to whom the writ is directed shall be required to produce at the hearing the body of the person detained.").

government in the arrest of a fugitive within its border is insufficient ... to constitute United States participation under the joint venture doctrine."); Keefe, 222 F.2d at 392 (allegation that United States officials did not intervene to "prevent[] the French from taking, trying, convicting and confining him" is insufficient to establish actual or constructive custody).  Where all of these factors are present, however, it blinks reality to conclude that the detainee is anything other than in the custody of the United States for purposes of habeas jurisdiction.[42]

The evidence that petitioners have supplied is considerable in the absence of discovery, and speaks to each of these points.  What is more, with a single narrow exception,[43] the United States has not offered evidence to rebut any of the information supplied and inferences reasonably raised by petitioners, even though such evidence is in many instances directly in its control.  Most important, if the facts alleged in the Petition were shown to be true, there would be habeas jurisdiction in this matter.  The Court will therefore authorize jurisdictional discovery in this case. This discovery will be expeditious but cautious, consistent with the substantial and delicate interests of foreign relations potentially involved.  See Phoenix Consulting, 216 F.3d at 40 ("jurisdictional discovery" involving foreign sovereigns "should be carefully controlled and limited"); Prakash v. American Univ., 727 F.2d 1174, 1179-80 (D.C. Cir. 1984) (district court possesses "considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction").  Nonetheless, petitioners will have an opportunity to establish the

---

[42]  The Court does not mean to imply that it has set out a comprehensive list of the factors that are relevant to the inquiry.  For instance, the presence of a formal relationship between the countries that governs the detention, in the nature of a treaty or otherwise, may bear on the jurisdictional question.

[43]  The United States submitted evidence only on the issue of the timing of the information received by the State Department regarding alleged Saudi plans to charge Abu Ali.

jurisdiction of this Court over their habeas petition and, if jurisdiction lies, to challenge the

legality of Abu Ali's continuing detention through their petition for a writ of habeas corpus.  An

accompanying order initiates the process of defining the scope of that discovery.


_____/s/  John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:  _December 16, 2004_

Copies to:

Morton Sklar
World Organization for Human Rights USA
1725 K Street, N.W., Suite 610
Washington, D.C. 20006
(202) 296-5702
    *Counsel for petitioners*

Judry L. Subar
Ori Lev
United States Department of Justice, Civil Division
Federal Programs Branch, Room 7138
P.O. Box 833
Washington, D.C. 20044
(202) 514-3969
(202) 514-2395
    *Counsel for respondents*